UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

683 CAPITAL PARTNERS, LP,      :

           Plaintiff,      :         Case No. 19 Civ. _____

           :

        v.           :

           :

THE REPUBLIC OF ARGENTINA,      :         **COMPLAINT**

           :

          Defendant.      :

           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## Nature of the Action

1.      Plaintiff 683 Capital Partners, LP ("Plaintiff") brings this action for breach of contract and breach of the covenant of good faith and fair dealing against the Republic of Argentina ("Argentina" or the "Republic") to seek redress for Argentina's bad faith refusal to pay Plaintiff millions of dollars owed on securities issued by Argentina in 2005 and that Plaintiff owns. Plaintiff makes the allegations set forth herein based on facts in the public record and upon information and belief.

2.      In 2005, Argentina issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: US040114GM64) as part of exchange offers pursuant to which its defaulted debt was exchanged for new securities issued by the Republic. The 2005 GDP-Linked Securities, which Plaintiff owns and from which Plaintiff's claims arise, are referred to herein specifically as the "2005 GDP Warrants."[1] Argentina's duty to pay investors that own the GDP Warrants depends on the performance of its economy.

---

[1] Argentina also issued additional GDP-linked securities in 2010 (ISIN: XS0501197262), which together with the 2005 GDP Warrants are referred to herein as the "GDP Warrants." The contract terms governing both sets of warrants are materially the same.

3.      The Governing Documents[2] of the GDP Warrants provide three conditions for determining whether a payment is due in in any given year (referred to as the "Reference Year"):

(1)      Actual Real Gross Domestic Product ("GDP") of Argentina is greater than Base Case GDP;

(2)      Actual Real GDP Growth of Argentina is greater than Base Case GDP Growth; and

(3)      the aggregate amount of all payments made on the GDP Warrants does not exceed a Payment Cap.

These terms, described below, are carefully defined in the Governing Documents, which provide detailed calculation instructions.

4.      By the end of 2013, economic indicators predicted that Argentina's Actual Real GDP, measured in 1993 prices, had grown at a high enough rate that Argentina would be required to make a payment to holders of the GDP Warrants for 2013, in accordance with the terms set forth in the Governing Documents.

5.      The expectations for Argentina's 2013 GDP growth rate were confirmed in February 2014, when the Republic's national economic statistics agency, the Instituto Nacional de Estadística y Censos ("INDEC"), published its Estimador Mensual de Actividad Económica ("EMAE") Index. The EMAE Index estimated that 2013 Actual Real GDP had grown by 4.91% measured in 1993 prices, far more than enough to trigger a payment obligation by Argentina.

6.      Because the EMAE Index was historically near-perfectly correlated with Actual Real GDP, Argentina knew definitively at that point that the three conditions for payment in the Governing Documents would be met. The Republic knew that it would not be able to avoid

---

[2] The "Governing Documents" for the 2005 GDP Warrants are (i) the Trust Indenture dated as of June 2, 2005 (a copy of which is attached hereto as Exhibit A) and (ii) the 2005 Form of Registered Global Security (the "Global Security") applicable to the 2005 GDP Warrants (a copy of which is attached hereto as Exhibit B). To the extent not otherwise defined herein, capitalized terms in this Complaint shall have the meanings set forth in the Global Security. Payments to holders of the 2010 GDP Warrants are calculated using the same methodology applicable to the 2005 GDP Warrants and as set forth in the Global Security.

paying as much as USD $1.1 billion to holders of the 2005 GDP Warrants once INDEC published its official figure for 2013 Actual Real GDP in March or April, as it normally would. At that point, it would have been obvious that the conditions for payment had been met.

7.      To duck its looming USD $1.1 billion obligation, Argentina decided to take improper advantage of its decision to re-base its GDP from 1993 to 2004 prices.  Argentina announced its decision to re-base in March 2014 before INDEC would ordinarily have published its official figure for 2013 Actual Real GDP in 1993 prices.  Re-basing changes the price levels that a country uses to measure *real* GDP growth (versus *nominal* GDP growth) to remove the impacts of inflation and deflation.  As described below, re-basing can have a dramatic effect on how countries present their GDP.  In Argentina's case, re-basing its GDP from 1993 prices to 2004 prices meant that the Republic could say that its economy only grew by 2.92% in 2004 prices, rather than 4.91% in 1993 prices (per the EMAE Index).

8.      Argentina then claimed that the 2.92% GDP growth rate was below the Base Case GDP Growth rate trigger in the Governing Documents and that therefore no payment was due to holders of the GDP Warrants for 2013.  As Guillermo Nielsen, the former Secretary of Finance for Argentina who held office when the Governing Documents were negotiated, has observed, this conclusion was incorrect.  The Governing Documents required Argentina to adjust the Base Case GDP Growth rate trigger from 1993 to 2004 prices in the event it re-based its GDP from the 1993 prices in effect when the Governing Documents were executed and the GDP Warrants were issued.  In other words, if the methodology for calculating Actual Real GDP changed, the Governing Documents required that Argentina re-calculate and change the hurdle for payment to the holders of the GDP Warrants in a corresponding manner.  Had Argentina followed those

contractually mandated steps, Mr. Nielsen rightly concluded, it would have had to acknowledge that a payment was due.

9.      Argentina sought to insulate its decision from challenge by ensuring that INDEC did not publish 2013 Actual Real GDP measured in 1993 prices. Doing so would not only have confirmed the EMAE Index's showing of 4.91% growth in 2013 but it would also have made clear that the conditions for payment had been met. But by ensuring that INDEC never published 2013 Actual Real GDP in 1993 prices, Argentina could wrongly claim—just like it has in already filed litigation before this Court—that the EMAE Index estimate of 2013 Actual Real GDP in 1993 prices is unreliable and should not be used to determine whether the payment conditions set forth in Paragraph 3 above were met.

10.      In the already filed litigation before this Court, Argentina claims that "binding effects" clauses in two provisions of the Global Security shield its determination that no payment was due from any challenge whatsoever, absent bad faith, willful misconduct, or manifest error. Argentina is wrong. The "binding effects" clauses do not absolve Argentina of the duty to follow the contract's specific calculation terms, including the duty to adjust 2013 Base Case GDP and 2013 Base Case GDP Growth to reflect the re-basing of GDP from 1993 to 2004 prices. Indeed, neither the definitions of Base Case GDP and Base Case GDP Growth, nor the provision setting forth the three conditions for payment contain anything that requires deference to Argentina's calculations. The "binding effects" clauses also do not permit Argentina to stymie the proper determination of whether the payment conditions were met by preventing the publication of 2013 Actual Real GDP in 1993 prices, one of the inputs into the formulas used to determine whether the conditions were met.

11.     Even if the binding effects clauses were applicable—they are not—Argentina's actions were demonstratively undertaken in bad faith and in willful disregard of the rights of holders such as Plaintiff and lead to manifestly erroneous results.  As revealed in judicial admissions made in this Court, Argentina ignored the provisions in the Governing Documents requiring adjustment of the Base Case GDP Growth rate trigger.  That is directly contrary to the letter of the parties' contract and, not surprisingly, manifestly erroneous.

12.     When Argentina's bad faith, willful error is corrected, it becomes clear that, for Reference Year 2013, Actual Real GDP exceeded the Base Case GDP, and Actual Real GDP Growth exceeded Base Case GDP Growth.  As a result, the GDP Warrants required Argentina to pay no less than USD $1,104,886,854, or 7.680% of the notional amount to holders of the 2005 GDP Warrants.  That amount should have been paid on December 15, 2014.  Argentina has breached its contractual obligations to Plaintiff by failing to properly calculate and make this payment.  In the alternative, Argentina has violated the covenant of good faith and fair dealing owed to Plaintiff.

13.     Plaintiff owns $343,331,000 notional amount of the 2005 GDP Warrants.  For Reference Year 2013, Argentina should therefore have paid Plaintiff no less than USD $26,367,928 on December 15, 2014 on account of Plaintiff's GDP Warrants.  No part of this amount has been paid, and accordingly Argentina currently owes Plaintiff $37,947,421 as of the date of this complaint, taking into account pre-judgment interest under New York law at the statutory rate of 9.0% per annum, computed on a simple interest basis.  Plaintiff therefore seeks judgment for damages in an amount equal to $37,947,421 plus all additional prejudgment interest through the entry of the judgment and post-judgment interest thereafter until payment is made.

## The Parties

14.     Plaintiff 683 Capital Partners, LP, is a Delaware limited partnership that owns USD $343,331,000 notional amount of the 2005 GDP Warrants.

15.     In the Global Security for the 2005 GDP Warrants, Argentina expressly acknowledged "the right of any beneficial owner of [GDP Warrants] to pursue [a remedy under the Governing Documents] with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security as if Certificated Securities had been issued to such beneficial owner." (2005 Global Security (Ex. B) at § 11.) Accordingly, Plaintiff has the right to bring this action on its own behalf to pursue the remedies available to a holder of the Global Security with respect to its beneficial holdings.

16.     Defendant the Republic of Argentina is a foreign state as defined in 28 U.S.C. § 1603(a).

## Jurisdiction, Venue and Choice of Law

17.     In the Governing Documents, Argentina explicitly and irrevocably waived sovereign immunity to the fullest extent permitted by the laws of the United States in any action with respect to the 2005 GDP Warrants. Thus, Argentina is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement, and this Court therefore has jurisdiction pursuant to 28 U.S.C. § 1330.

18.     In the Governing Documents, Argentina irrevocably submitted to the jurisdiction of this Court over any action with respect to the 2005 GDP Warrants, and appointed Banco de la Nación Argentina, at its office at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.

19.     In the Governing Documents, Argentina waived any objection based on venue or

otherwise to any action with respect to the 2005 GDP Warrants being brought in this Court, and

venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

20.     Argentina agreed that the Governing Documents shall be governed by, and

construed in accordance with, the laws of the State of New York without regard to principles of

conflicts of laws.

### **Factual Allegations**

**A.     Argentina's Debt Crisis and the 2005 and 2010 Debt Exchanges**

21.     In December 2001, while in the midst of an economic crisis, Argentina announced

that it would defer interest and principal payments to its warrant holders, and the Republic

defaulted on approximately USD $81 billion of sovereign debt.

22.     The Republic's default prompted extensive litigation.  On January 14, 2005, the

Republic launched a voluntary debt exchange. This exchange involved trading in non-performing

securities (which encompassed 152 different bonds, originally issued in 14 different currencies)

in exchange for different securities.  The Republic launched a similar exchange in 2010.  Both

the 2005 and 2010 exchanges led to the issuance of the GDP Warrants.

23.     Argentina's misconduct has damaged holders of both the 2005 and 2010 GDP

Warrants.  Plaintiff's claims, however, relate only to the 2005 GDP Warrants as those are the

only securities it holds.

**B.     GDP Warrants**

24.     Argentina's GDP Warrants were among a new class of GDP-linked bonds that

tied investors' returns to the economic performance of the country issuing the bonds as reflected

in that country's GDP.  A country that has issued GDP-linked bonds, such as Argentina, only

pays its warrant holders if its GDP meets certain contractually agreed-upon criteria.  In that way,

GDP-linked bonds are a hybrid between equity investment and debt, since there is no fixed return and purchasers have an interest in the overall economic performance of the issuing country. At the same time, GDP-linked bonds protect the issuer, since if GDP growth is below the contractually agreed-upon trigger, no payments are owed, and indeed, in the case of Argentina's GDP Warrants, no principal is ever paid.

25.     Using GDP as a reference variable makes sense for both issuers and investors. It is widely published, comparable across countries, and can be forecasted based on public and private estimates and data. It is a commonly used and widely accepted measure of a country's output. International institutions such as the United Nations and the International Monetary Fund check for consistency of GDP data and work on improving national and international standards for measuring GDP.

### C.     Basic GDP Concepts

26.     GDP is the market value of all goods and services produced by labor and property within a country. It is calculated as the sum of personal consumption, business investment, government spending, and net exports. It can be presented as nominal GDP and real GDP.

27.     Nominal GDP for any given year is measured using current prices and therefore includes the effects of price changes (*i.e.*, inflation or deflation) during the applicable period. As a result, when comparing one year's nominal GDP to another year's nominal GDP, some portion of the difference will be due to inflation (or deflation), rather than the actual change in the output of the economy. Put another way, some of the percentage growth in nominal GDP from one year to the next is attributable only to a change in prices of goods or services, not to a change in the amount of those goods or services a country actually produces.

28.     To make year-over-year comparisons of output without the distorting effect of price inflation or deflation, economists use real GDP. Real GDP is a measure of output using the

prices of a particular base year.  Up until 2014, Argentina used 1993 as its base year and published its real GDP in 1993 constant prices.  The Governing Documents use the term "Actual Real GDP" for real GDP.

29.     Thus, to determine Argentina's year-over-year GDP growth rate without the skewing effects of inflation or deflation, one could compare the current year's Actual Real GDP in 1993 prices to the prior year's Actual Real GDP, also in 1993 prices, and calculate the growth rate.  For example, Argentina's Actual Real GDP growth rate for 2013 could be determined by dividing 2013 Actual Real GDP in 1993 prices by 2012 Actual Real GDP in 1993 prices and then subtracting 1.

30.     A measure of price inflation or deflation with respect to a specific base year is the GDP deflator.  For any given year, the GDP deflator is the ratio of nominal GDP measured in current prices to real GDP measured in base year prices.

31.     As explained in more detail below, nominal GDP, real GDP (Actual Real GDP), and the GDP deflator are all inputs into the calculations Argentina is required to use in determining whether a payment is due on the GDP Warrants and the amount of such payment.  In 2014, Argentina failed to perform those calculations because it did not generate Actual Real GDP for 2013 in 1993 prices, one of the required inputs into the calculations.  Instead, it wrongfully declared that no payment was due.

**D.     The Effect on GDP of Changing the Base Year**

32.     When calculating real GDP, countries use weights of different sectors of their economies and extrapolate total economic output for the economy using those sector weights.  These weights correspond to the structure of prices as of the base year.  Such structure of relative prices changes as time progresses, which can lead to over- or under-representation of some economic sectors in the GDP measure.  This is because, when measuring real GDP for a given

year, the output quantities are weighted using the prices of the base year. For example, the relative sector weights of farming and technology of a developing economy based on a 1990 base year may not accurately reflect those sectors two decades later as the economy has developed.

33.     In order to account for such changes, countries engage in periodic data gathering exercises to update the base year used to calculate real GDP in order to reflect the structure of relative prices of different sectors of the economy. This practice is called re-basing. In early 2014 (for calculating 2013 GDP), Argentina changed its base year from 1993 to 2004.

34.     Re-basing can dramatically affect a country's calculation of real GDP. For example, in 2014 Nigeria changed its base year from 1990 to 2010. This re-basing increased Nigeria's GDP in 2013 from USD $270 billion in the "old series" using 1990 as the base year to USD $510 billion in the "new series" using 2010 as the new base year, a change of 89%. In 2014, Kenya similarly changed its base year from 2001 to 2009, which resulted in an increase in 2013 of GDP from USD $44.1 billion in the old series to USD $55.2 billion in the new. Other countries that re-based in the last several years include Tanzania, Uganda, and India.

35.     Re-basing GDP can also have a dramatic effect on the calculation of the rate of real GDP growth. Different sector weighting and other changes in methodology often result in significant differences in GDP growth measured using the old series and the new series. For example, in the case of Nigeria, the real GDP growth rate for 2012 measured in the old 1990 series was 6.58%, but measured in the new 2010 series, it was only 4.21%. These differences in the growth rate are the result of changing the method of measuring the economy, not in the actual level of output of a country's economy.

36.     Nigeria's economy did not actually increase in size by 89% overnight when it re-based. Rather, the way Nigeria measured its economy changed. Therefore, when countries re-base, they ordinarily publish real GDP for the re-basing year in both the old series and the new series. This makes it possible to accurately describe growth in real GDP over time, accounting for the effect of the change in the base year. Nigeria, Kenya, Tanzania, Uganda, and India all did this. Argentina did not. In early 2014, when it re-based to 2004 prices, it only published Actual Real GDP in the new base year prices (2004) for 2013. It did not publish Actual Real GDP in the old base year prices (1993). It has not published full-year Actual Real GDP in 1993 prices since 2012.

37.     Since GDP calculated using two different years of base prices will be different, and growth rates calculated on the basis of the different years will also be different, sometimes dramatically, the documents governing GDP-linked securities need to account for the effects of re-basing and ensure that re-basing is not used by governments as a way to avoid their payment obligations. "The key is to specify ex ante in the debt contract a clear method for dealing with revisions. . . . If there was a major change in methodology of data calculation, Governments could be required to keep separate GDP series calculated with the old methodology until the bonds mature."[3]

38.     In the case of Argentina's GDP Warrants, the Governing Documents provide detailed instructions to account for the effect of re-basing on the conditions that determine when payment is due. As explained further below, after Argentina re-based in 2014, it did not follow those instructions and instead improperly used its re-basing of its GDP from 1993 to 2004 to avoid payment to holders of the GDP Warrants for 2013. Had it followed the terms of the

---

[3] S. Griffith-Jones & K. Sharma, GDP-Indexed Bonds: Making It Happen, DESA Working Paper No. 21, April 2006, at 8 (internal citations omitted).

Governing Documents and properly accounted for the effect of re-basing, Argentina would have concluded that a payment was due.

### E.    INDEC's Publication of GDP

39.    Most countries have a national economic statistics agency whose job it is to generate and refine GDP calculations and to issue the country's official GDP figures.  In 2013 and 2014, INDEC was the Argentine government entity that issued official government statistics. Investors in the GDP Warrants relied on INDEC statistics as a source of data integrity.  For all years leading up to 2013, investors had access to and the ability to cross-check the sources of any calculations undertaken by Argentina's Ministry of Economy.

40.    INDEC publishes, in its monthly publication "INDEC Informa," GDP for every quarter during the year, typically four months after the close of the quarter.  For example, INDEC usually publishes GDP for the first quarter in July of the same year, second quarter GDP in October of the same year, third quarter GDP in January of the following year, and fourth quarter GDP (meaning GDP for the full year) in April of the following year.  Thus, by April, INDEC has published its GDP figures for the prior year.

41.    Those GDP figures are sometimes adjusted after their April publication.  But, as set forth in the chart below, for the years 2003 through 2012, those corrections resulted in only small adjustments to the growth rate for two years:  2003 (+0.1%) and 2008 (-0.2%).

12

| Full Year | Original values – full year | | | Last published value – full year | |
|---|---|---|---|---|---|
| | Date of publication | GDP – ARS[4] MM (1993 prices) | Annual growth (%) | GDP – ARS MM (1993 prices) | Annual growth (%) |
| 2003 | Apr-04 | 255.751 | 8.7% | 256.023 | 8.8% |
| 2004 | Apr-05 | 279.020 | 9.0% | 279.141 | 9.0% |
| 2005 | Apr-06 | 304.815 | 9.2% | 304.764 | 9.2% |
| 2006 | Apr-07 | 330.534 | 8.5% | 330.565 | 8.5% |
| 2007 | Apr-08 | 359.189 | 8.7% | 359.170 | 8.7% |
| 2008 | Mar-09 | 384.201 | 7.0% | 383.444 | 6.8% |
| 2009 | Apr-10 | 386.704 | 0.9% | 386.704 | 0.9% |
| 2010 | Apr-11 | 422.130 | 9.2% | 422.130 | 9.2% |
| 2011 | Apr-12 | 459.571 | 8.9% | 459.571 | 8.9% |
| 2012 | Apr-13 | 468.301 | 1.9% | 468.301 | 1.9% |

*Sources: INDEC Informa, ISSN 0328-5804; INDEC Real Gross Domestic Product (1993 prices).*

**F.**     **INDEC's Publication of the EMAE Index**

42.     INDEC also publishes estimates of economic growth throughout the year using a very similar methodology as the one it uses to calculate GDP. In generating these estimates, INDEC uses the same sector weights and the same data sources, whenever available, as it uses for its GDP calculations. These estimates are known as the EMAE Index.

43.     The EMAE Index growth rates are usually published within two or three months of the close of the relevant period. This means that EMAE Index growth rates are typically available to the public and to investors before INDEC publishes official quarterly and annual GDP figures. For example, EMAE Index figures for December (corresponding to the full year ending on December 31) are published in January or February of the following year. The annual GDP figures, by contrast, are not published by INDEC until one or two months later, in late March or April.

44.     Over time, the EMAE Index estimate of growth published in January or February has proven to be a highly reliable predictor of the GDP growth rates later published by INDEC. The table below compares, for the years 2002 through 2012, the annual growth rates indicated by

---

[4] The currency code for the Argentine peso is ARS.

13

the EMAE Index as originally published in January or February against the GDP growth rates as

later published by INDEC.

| Year | Annual growth rate | | Difference |
|------|--------------------|-------------------|------------|
| | EMAE Index – full year (1993 prices) | GDP (1993 prices) | |
| **2002** | -11.1% | -10.9% | -0.2% |
| **2003** | 8.4% | 8.8% | -0.4% |
| **2004** | 8.8% | 9.0% | -0.2% |
| **2005** | 9.1% | 9.2% | -0.1% |
| **2006** | 8.5% | 8.5% | 0.0% |
| **2007** | 8.7% | 8.7% | 0.0% |
| **2008** | 7.1% | 6.8% | 0.3% |
| **2009** | 0.9% | 0.9% | 0.0% |
| **2010** | 9.1% | 9.2% | -0.1% |
| **2011** | 8.8% | 8.9% | -0.1% |
| **2012** | 1.9% | 1.9% | 0.0% |
| **2013** | 4.9% | N/A | N/A |

*Sources: INDEC Información de Prensa, ISSN 0327-7968; INDEC Real Gross Domestic Product (1993 prices.)*

45.    For four of the years listed above (2006, 2007, 2009, and 2012), the EMAE Index

matched the GDP growth rate exactly.  For the other years except for 2008, the EMAE Index

showed a slightly lower GDP than INDEC finally calculated, meaning that, according to INDEC,

Argentina's economy was more productive than the EMAE Index showed.  Only for 2008 did

the EMAE Index present too rosy a picture, but even in that year it was off by only three-tenths

of a percent.  In that year, GDP grew by an impressive 6.8 percent, slightly less than the 7.1

percent shown by the EMAE Index.[5]

46.    The annual growth rates indicated by the EMAE Index are occasionally adjusted

after their initial publication in February.  But for the years 2002 through 2012, only in 2008 was

the EMAE Index growth rate adjusted down (by only three-tenths of a percentage point).  In the

other years, to the limited extent there were any adjustments to the EMAE Index annual growth

---

[5] The initial 2008 GDP published by INDEC in March 2009 was 7.0 percent, just one-tenth of a percent below the level predicted by the EMAE Index.  (*See supra* ¶ 41.)

14

rate, those adjustments reflected a higher rate of growth—meaning Argentina's economy

actually did better in those years than INDEC predicted when it first published the EMAE Index.

The chart below shows, for the years 2002 through 2012, the original growth rates predicted by

the EMAE Index and the later revised values.

| Full Year | Date of publication | Original values – full year | Date of Revision | Revised values – full year |
|---|---|---|---|---|
| | | EMAE annual growth (%) | | EMAE annual growth (%) |
| 2002 | Feb-03 | -11.1% | Mar-03 | -10.9% |
| 2002 | Mar-03 | -10.9% | Jun-03 | -10.9% |
| 2003 | Feb-04 | 8.4% | Mar-04 | 8.7% |
| 2003 | Mar-04 | 8.7% | Jun-04 | 8.8% |
| 2004 | Feb-05 | 8.8% | Mar-05 | 9.0% |
| 2005 | Feb-06 | 9.1% | Mar-06 | 9.2% |
| 2008 | Jan-09 | 7.1% | Mar-09 | 7.0% |
| 2008 | Mar-09 | 7.0% | Jun-09 | 6.8% |
| 2010 | Feb-11 | 9.1% | Mar-11 | 9.2% |
| 2011 | Feb-12 | 8.8% | Mar-12 | 8.9% |
| 2012 | Feb-13 | 1.9% | Mar-13 | 1.9% |

Source: INDEC Información de Prensa, ISSN 0327-7968.

47.     For the years through 2012, INDEC published both the EMAE Index's annual

GDP growth rates and the official GDP figures like clockwork.  For reasons that will be

explained below (infra ¶¶ 80–84, 105–112), INDEC failed to publish GDP figures in 1993 prices

for full-year 2013.  However, the EMAE Index published in February 2014 estimated that GDP

growth for 2013, as measured in 1993 prices, would be 4.91%.  Based on that information,

investors anticipated that Argentina would make a payment on the GDP Warrants.

**G.     The Calculation of Payment on Argentina's GDP Warrants**

48.     Broadly speaking, under the Governing Documents for the 2005 GDP Warrants,

Argentina is required to make a payment (the "Payment Amount") for a given calendar year (or

Reference Year) to holders of the securities if the Republic's GDP during that Reference Year

meets certain criteria.  In years that Argentina's GDP grew faster than a specific threshold,

warrant holders would receive a payment calculated on the basis of what the Governing Documents describe as "Excess GDP." Subject to certain limitations, the faster the economy grew, the greater a payment the warrant holders are entitled to.

49.     The criteria set forth in the Governing Documents for when a payment is due rely on GDP figures calculated in 1993 prices because that was the base year used in INDEC's GDP statistics when the 2005 GDP Warrants were issued. The Payment Amount is determined on the Calculation Date, defined in the Global Security as "for any Reference Year, the 1st of November of the calendar year following such Reference Year"; and payment is supposed to be made on the Payment Date, defined in the Global Security as "for any Reference Year, the 15th of December of the calendar year following such Reference Year[.]"   So for Reference Year 2013, the Calculation Date was November 1, 2014 and the Payment Date was December 15, 2014.

50.     According to the Global Security, three conditions must be met in order for a Payment Amount to be due:

> (1)     Actual Real GDP is greater than Base Case GDP;
>
> (2)     Actual Real GDP Growth is greater than Base Case GDP Growth;
>
> (3)     The aggregate amount of all payments made on the GDP Warrants does not exceed a Payment Cap.

51.     Up until 2014, there was no issue with the way Argentina applied the three conditions or calculated the Payment Amount. However, in early 2014 (for the year 2013), faced with clear evidence that a Payment Amount would be due, Argentina decided to exploit its decision to re-base GDP from 1993 to 2004 to improperly avoid having to meet its payment obligation.

52.     Importantly, while the Governing Documents contemplate that Argentina can change the base year used to measure Actual Real GDP, they set forth directions regarding how

to convert GDP figures measured in 1993 prices to GDP figures measured in a new base year's prices. In particular, the Governing Documents provide specific instructions on how to adjust the inputs to the conditions above and calculate the Payment Amount to account for the change in base year and the resulting change in growth rates. This makes sense because changes in base year can dramatically affect the determination of GDP growth rates. (*See supra* ¶¶ 34–37.)

53.     These instructions prevent Argentina from avoiding a payment obligation by re-basing, but Argentina has ignored them. The Republic has wrongly claimed that its GDP growth rate for 2013 as measured in 2004 prices was below the contractual growth rate trigger for payment because it has not adjusted the growth rate trigger as the Governing Documents require. And it has tried to prevent warrant holders from challenging its improper determination that no payment was due by preventing the publication of key data (specifically 2013 Actual Real GDP in 1993 prices) that, when subjected to the calculations set forth in the Governing Documents, would show that indeed a Payment Amount was due for 2013. Therefore, its conclusion that no payment was due was manifestly erroneous.

### H.     First Condition: Actual Real GDP Is Greater Than Base Case GDP

54.     The Global Security states that Actual Real GDP "means, for any Reference Year, the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC." This is just real GDP as described above in Paragraph 28.

55.     Year of Base Prices as defined in the Global Security "means the year 1993; provided that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices

shall mean such other calendar year." The Year of Base Prices was 1993 until Argentina changed it in early 2014 to 2004.

56. The Global Security states that Base Case GDP "means, for any Reference Year, the amount set forth in the chart below for such year":

| Reference Year | Base Case GDP (in millions of constant 1993 pesos) | Reference Year | Base Case GDP (in millions of constant 1993 pesos) |
|---|---|---|---|
| 2005 | 287.012.52 | 2020 | 458.555.87 |
| 2006 | 297.211.54 | 2021 | 472.312.54 |
| 2007 | 307.369.47 | 2022 | 486.481.92 |
| 2008 | 317.520.47 | 2023 | 501.076.38 |
| 2009 | 327.968.83 | 2024 | 516.108.67 |
| 2010 | 338.675.94 | 2025 | 531.591.93 |
| 2011 | 349.720.39 | 2026 | 547.539.69 |
| 2012 | 361.124.97 | 2027 | 563.965.88 |
| 2013 | 372.753.73 | 2028 | 580.884.85 |
| 2014 | 384.033.32 | 2029 | 598.311.40 |
| 2015 | 395.554.32 | 2030 | 616.260.74 |
| 2016 | 407.420.95 | 2031 | 634.748.56 |
| 2017 | 419.643.58 | 2032 | 653.791.02 |
| 2018 | 432.232.88 | 2033 | 673.404.75 |
| 2019 | 445.199.87 | 2034 | 693.606.89 |

(Ex. B. at R-2–R-3.)

57. As is clear from the words "in millions of constant 1993 pesos" at the top of the second and fourth columns of this chart, Base Case GDP as defined in the Global Security is measured in 1993 prices. Thus, for any Reference Year, if Actual Real GDP in 1993 prices exceeded the Base Case GDP listed above (again in 1993 prices), the first condition for payment on the GDP Warrants would be satisfied.

58. As noted above, however, the Global Security contemplated that Argentina might re-base and change the Year of Base Prices, as it did for 2013 in early 2014. Therefore, in the definition of Base Case GDP, the Global Security provided further:

> that if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP *for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices* by multiplying the Base Case GDP for such Reference Year (as set forth in the chart above) by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of

the Year of Base Prices, and the denominator of which shall be the Actual Real
GDP for such Reference Year measured in constant 1993 prices.

(Ex. B at R-3 (emphasis added).)

59.     For 2013, the year for which Argentina first changed the Year of Base Prices from

1993 to 2004, this calculation can be represented graphically as:



60.     Argentina did not do this calculation, which was required by the Governing

Documents, because INDEC, the Republic's statistics agency, did not publish 2013 Actual Real

GDP in 1993 prices (the denominator in the Adjustment Factor fraction above); instead it

published 2013 Actual Real GDP only in 2004 prices (the numerator).

61.     Therefore, in concluding that no Payment Amount was due, Argentina did not

determine the 2013 Base Case GDP adjusted for 2004 prices and therefore did not determine

whether the first condition was met (*i.e.*, was 2013 Actual Real GDP measured in 2004 prices

greater than 2013 Base Case GDP adjusted for the new 2004 base year?).  Argentina's failure to

publish 2013 Actual Real GDP in 1993 prices was a willful effort to prevent the proper

determination of whether a Payment Amount was due.

62.     It is possible, however, to determine whether the first condition would have been satisfied had Argentina permitted INDEC to publish Actual Real GDP for 2013 in 1993 prices by using INDEC's EMAE Index, which reliably tracks GDP. (*See supra* ¶¶ 42–46.)

63.     In February 2014, the EMAE Index indicated that GDP growth for 2013 was 4.91%. Applying that growth rate to the 2012 Actual Real GDP (measured in 1993 prices) yields ARS 491,314 MM as the 2013 Actual Real GDP (measured in 1993 prices), *i.e.*, ARS 468,301 MM multiplied by 1.0491 equals ARS 491,314 MM. The calculation is shown below:



64.     With the 2013 Actual Real GDP (measured in 1993 prices), it is then possible to calculate the 2013 Base Case GDP in 2004 prices in the manner required by the Global Security in the definition of Base Case GDP as described above in Paragraphs 58 and 59. This calculation requires two steps:  (i) obtain the ratio between 2013 Actual Real GDP in 2004 prices (ARS 869,520 MM, as published by INDEC) and the 2013 Actual Real GDP in 1993 prices (ARS 491,314 MM, based on the EMAE Index) and (ii) multiply the 2013 Base Case GDP in 1993 prices listed in the Global Security (ARS 372,754 MM) by that ratio in order to adjust Base Case GDP from 1993 to 2004 prices. That yields ARS 659,695 MM as the 2013 Base Case GDP in 2004 prices. The calculation is illustrated below:



65.     Because 2013 Actual Real GDP in 2004 prices (ARS 869,520 MM) is greater than 2013 Base Case GDP (properly adjusted for 2004 prices) (ARS 659,695 MM), it is clear that the first condition for payment is satisfied.  Had Argentina published 2013 Actual Real GDP in 1993 prices and done the calculations the Governing Documents required in the event of a re-basing, it would have had to recognize that the first condition was met.

I.      **Second Condition:  Actual Real GDP Growth Is Greater Than Base Case GDP Growth**

66.     The second condition requires a determination as to whether Actual Real GDP Growth from 2012 to 2013 was greater than Base Case GDP Growth from 2012 to 2013.

67.     Actual Real GDP Growth as defined in the Global Security "means, for any Reference Year, the percentage change in Actual Real GDP for such Reference Year, as compared to Actual Real GDP for the immediately preceding Reference Year . . . ."

68.     Base Case GDP Growth as defined in the Global Security "means, for any Reference Year, the percentage change in Base Case GDP for such Reference Year, as compared to Base Case GDP for the immediately preceding Reference Year . . . ."  As described above (*see supra* ¶¶ 56–58), Base Case GDP means for the applicable Reference Year, the GDP figures set

forth in the chart from the Global Security copied into Paragraph 56, assuming Argentina had not re-based.

69.     In the ordinary course, prior to Argentina's re-basing, determining whether the second condition had been met was simple.  For 2013, for example, had Argentina not re-based, the question would have been whether the growth rate reflected by the calculation on the left below (Actual Real GDP Growth in 1993 prices) was greater than the growth rate reflected by the calculation on the right (Base Case GDP Growth in 1993 prices):



70.     Had Argentina not re-based in early 2014, it is clear from the calculation above that the Second Condition would have been easily satisfied.  Actual Real GDP Growth in 1993 prices was 4.91% (according to INDEC's EMAE Index), while Base Case GDP Growth in 1993 prices was 3.22% (as determined from the Base Case GDP figures set forth in the Global Security chart copied at Paragraph 56, above).

71.     However, because Argentina re-based in early 2014, thereby changing the Year of Base Prices from 1993 to 2004, it was contractually bound to (i) calculate the Actual Real GDP Growth rate in 2004 prices; (ii) adjust the Base Case GDP numbers for both 2012 and 2013 from 1993 prices to 2004 prices according to the formula set forth in the definition of Base Case GDP

that applies when the base year is changed; (iii) calculate the Base Case GDP Growth rate using

the Base Case GDP figures for 2012 and 2013 adjusted for the change in base year; and (iv)

determine whether the Actual Real GDP Growth rate as measured in 2004 prices exceeded the

Base Case GDP Growth rate adjusted for the change to 2004 as the new base year.

72.    The purpose of these adjustments is to make sure that, in the event of a re-basing,

the rates of Actual Real GDP Growth and Base Case GDP Growth are all compared using the

same base year—2004 after Argentina re-based in 2014.  Because Argentina changed the base

year from 1993 to 2004, the second condition, when satisfied, can be illustrated as follows:



73.    The first step in order to determine whether the second condition was satisfied

when Argentina re-based is to determine Actual Real GDP Growth for 2013 in 2004 prices.  This

is possible because INDEC published Actual Real GDP for both 2012 and 2013 in 2004 prices.

INDEC reported Actual Real GDP for Reference Year 2013 measured in 2004 prices as ARS

869.5 billion.  According to INDEC, Actual Real GDP for Reference Year 2012 measured in

2004 prices was ARS 844.8 billion.  Thus, Actual Real GDP Growth for Reference Year 2013

measured in 2004 prices was 2.925% (ARS 869.5 billion divided by ARS 844.8 billion, minus

1).

74.     The second step is to determine the Base Case GDP numbers for both 2012 and 2013 adjusted to 2004 prices, according to the formula set forth in the definition of Base Case GDP that applies when the base year is changed.  Argentina was required to adjust the Base Case GDP for 2012 and 2013 provided in the Global Security from 1993 prices to 2004 prices because the definition of Base Case GDP Growth requires Argentina to do a calculation using the Base Case GDP for two different Reference Years, the current one and the immediately prior one: "for any Reference Year [*e.g.*, 2013], the percentage change in *Base Case GDP for such Reference Year* [*e.g.*, 2013], as compared to *Base Case GDP for the immediately preceding Reference Year* [*e.g.*, 2012] [.]" (Ex. B at R-2 (emphasis added).)

75.     And the definition of Base Case GDP in turn provides that in the event Argentina re-based, "the Base Case GDP for ***each*** Reference Year ***shall be adjusted*** to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year (as set forth in chart [contained in the Global Security]) by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices." (*Id.* (emphasis added).)  The phrase "each Reference Year shall be adjusted" makes clear (i) that the adjustment is to both the current Reference Year and the immediately preceding one and (ii) that the adjustment is mandatory.

76.     The 2013 Base Case GDP in 2004 prices, which was calculated above at Paragraph 64 using the EMAE Index rate of growth to derive 2013 Actual Real GDP in 1993 prices, is ARS 659,695 MM.

77.     The formula used to determine Base Case GDP for 2012 in 2004 prices is the same as that used for Base Case GDP for 2013 in 2004, but with the corresponding 2012 inputs.

INDEC published all the 2012 data necessary to complete this calculation: (i) divide ARS

844,807 MM by ARS 468,301 MM to derive the ratio between 2012 Actual Real GDP in 2004

and 1993 prices and (ii) multiply the 2012 Base Case GDP in 1993 prices listed in the Global

Security (ARS 361,125 MM) by the ratio derived in (i) in order to adjust it to 2004 prices.  Those

calculations, illustrated below, result in 2012 Base Case GDP in 2004 prices of ARS 651,464

MM:



78.     The third step is to determine the rate of Base Case GDP Growth, accounting for

the change in Base Year from 1993 to 2004, by dividing the 2013 Base Case GDP in 2004 prices

by the 2012 Base Case GDP in 2004 prices.  As noted in in Paragraph 64, the 2013 Base Case

GDP in 2004 prices was ARS 659,695 MM, and as noted in Paragraph 77, the 2012 Base Case

GDP in 2004 prices was ARS 651,464 MM.  Thus, the Base Case GDP Growth rate for

Reference Year 2013 measured in 2004 prices was 1.263% (ARS 659,695 MM divided by ARS

651,464 MM, minus 1).

79.     The fourth and final step is to compare the Base Case GDP Growth rate adjusted

for 2004 prices to the rate of Actual Real GDP Growth for 2013 measured in 2004 prices.  If the

rate of Actual Real GDP Growth in 2004 prices is greater than the Base Case GDP Growth rate

adjusted for 2004 prices, the second condition is met, notwithstanding the change in the Year of Base Prices.

80.     That comparison, illustrated below, shows that the rate of Actual GDP Growth measured in 2004 prices (2.92%) would have easily exceeded the rate of Base Case GDP Growth measured in 2004 prices (1.26%).  Had Argentina complied with its obligations, it would have found that the second condition was met.



81.     Although the Republic was contractually required to make this determination by the Governing Documents, Argentina did not do so.  Determining the Base Case GDP growth rate for 2013 in light of Argentina's decision to re-base required Argentina to multiply the Base Case GDP Growth in 1993 prices listed in the Global Security (and duplicated at Paragraph 56) by the ratio between the 2013 Actual Real GDP measured in 2004 prices and the 2013 Actual Real GDP measured in 1993 prices.  But Argentina did not publish 2013 Actual Real GDP measured in 1993 prices because it willfully and in bad faith sought to prevent the determination of whether the conditions for a Payment Amount were satisfied.

82.     Once it decided not to publish 2013 Actual Real GDP in 1993 prices—although it was required to do so—Argentina took an extra-contractual shortcut.  Instead of comparing

Actual Real GDP Growth in 2004 prices to Base Case GDP Growth in 2004 prices, it compared Actual Real GDP Growth in 2004 prices to Base Case GDP Growth in <u>1993</u> prices. This was contrary to the clear directions set forth in the definitions of Base Case GDP and Base Case GDP Growth that applied when Argentina re-based.

83.     Moreover, it is illogical and economically nonsensical to compare GDP growth rates using two different base years. Investors bought the GDP Warrants with the understanding that (i) Argentina would have to make payment if the rate of Base Case GDP Growth (derived from Base Case GDP as measured in "*millions of constant 1993 pesos*") exceeded certain thresholds and (ii) Argentina would have to adjust the Base Case GDP figures used to derive Base Case GDP Growth in the event it re-based from 1993 prices to the new base year's prices.

84.     By making the comparison between Actual GDP Growth in 2004 prices and Base Case GDP Growth in 1993 prices, not 2004 prices, Argentina erroneously claimed that the second condition was not satisfied and thus no payment was due.

**J.     The Calculation of the Payment Amount**

85.     The calculation of the Payment Amount requires a determination of Available Excess GDP, which in turn requires a determination of Excess GDP. The calculation of Excess GDP has several inputs, including Base Case GDP, which, as discussed above (*see supra* ¶¶ 56–58), must be adjusted if Argentina re-bases, as it did for Reference Year 2013. The ratio used to adjust Base Case GDP requires Actual Real GDP in 1993 prices. Argentina did not make that adjustment because it did not publish Actual Real GDP for 2013 in 1993 prices.

86.     Payment Amount as defined in relevant part in the Global Security "means for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the

notional amount of this Security outstanding as of such Payment Date . . . ." That calculation can be illustrated as:



87.    Available Excess GDP as defined in the Global Security "means, for any Reference Year, an amount in Argentine pesos equal to (i) 5% of Excess GDP for such Reference Year, multiplied by (ii) the Unit of Currency Coefficient." The Unit of Currency Coefficient is defined in the Global Security to be 0.012225. That calculation can be illustrated as:



88.    Excess GDP as defined in relevant part in the Global Security "means, for any Reference Year, the amount (expressed in billions of Argentine pesos), if any, by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base Case GDP for such Reference Year."

89.    Nominal Base Case GDP, in turn, as defined in the Global Security "means, for any Reference Year, an amount equal to Base Case GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year."

90.     The GDP Deflator as defined in the Global Security "means, for any Reference Year, the number that results from dividing (i) the gross domestic product of Argentina for such Reference Year measured at the current prices of such Reference Year, as published by INDEC, by (ii) the Actual Real GDP for such Reference Year."

91.     Prior to Argentina's re-basing, the calculation to determine Excess GDP, could be illustrated as:



92.     As a result of Argentina's re-basing, two of the inputs are different.  First, Actual Real GDP in 2004 prices should be the denominator for the GDP Deflator, rather than Actual Real GDP in 1993 prices.  This is because Actual Real GDP is defined with reference to the Year of Base Prices, which was 2004 after the re-basing.  Second, Base Case GDP should be converted from 1993 to 2004 prices, as required by the definition of Base Case GDP in the event of a re-basing.

93.     As set forth above, Argentina did not calculate the 2013 Base Case GDP adjusted to 2004 prices because one of the inputs to make that adjustment is 2013 Actual Real GDP in 1993 prices, which Argentina prevented INDEC from publishing.

94.     As stated above, Base Case GDP for 2013 adjusted to 2004 prices is ARS 659,695

MM, calculated using INDEC's EMAE Index to derive 2013 Actual Real GDP in 1993 prices.

(*See supra* ¶ 64.)  The other inputs into the formula for 2013 Excess GDP—2013 Nominal GDP

and 2013 Actual Real GDP in 2004 prices—were published by INDEC.

95.     Dividing 2013 Nominal GDP of ARS 3,339,630 MM by the 2013 Actual Real

GDP of 869,520 MM results in 3.84 as the GDP Deflator.  The GDP Deflator multiplied by 2013

Base Case GDP adjusted to 2004 prices gives 2013 Nominal Base Case GDP of ARS 2,533,737

MM, *i.e.*, 3.84 multiplied by 659,695 MM.

96.     The difference between 2013 Nominal GDP and 2013 Nominal Base Case GDP

gives 2013 Excess GDP of ARS 805.89 BN, *i.e.*, ARS 3,339,630 MM minus ARS 2,533,737

MM, expressed in billions of Argentine pesos.  The complete calculation of 2013 Excess GDP is

illustrated below:



97.     Plugging that number into the formula for Available Excess GDP, illustrated in

Paragraph 87 above, results in 0.49260 Argentine pesos per United States dollar of notional

amount of the GDP Warrants, *i.e.* ARS 805.89 BN times 0.05 times 0.012225:



98.      To convert Available Excess GDP into U.S. dollars, the Global Security directs

the use of the average free market exchange rate of Argentina pesos to United States dollars

during the 15 days preceding December 31 of the Relevant Reference Year, which for Reference

Year 2013 was 6.41407 ARS/USD.  The notional amount of outstanding 2005 GDP Warrants

was approximately USD $14.4 billion as of December 15, 2014.  Thus, the Payment Amount for

2013 is at least USD $1,104,886,854 (0.49260 divided by 6.41407 multiplied by $14.4 billion) or

USD $0.07680 per notional dollar of 2005 GDP Warrants.



99.      683 Capital holds a notional amount of USD $343,331,000.  Therefore, the

Payment Amount due in connection with Plaintiff's GDP Warrants is at least USD $26,367,928

(0.49260 divided by 6.41407 multiplied by USD $343,331,000), before pre- and post-judgment

interest.

### K.      Third Condition:  The Aggregate Amount of All Payments Made on the GDP Warrants Does Not Exceed the Payment Cap.

100.      As to the third condition, there is no doubt that it was met.  The Global Security defines the Payment Cap as "on any given day, an amount equal to [a certain percentage—48.000% in the case of the 2005 GDP Warrants] of the notional amount of this Security outstanding as of such day."  As of the Calculation Date for Reference Year 2013, 29.960% of the notional amount—or USD $0.2996 per notional dollar of 2005 GDP Warrants—remained under the Payment Cap.   Because the Payment Amount for Reference Year 2013—7.680% of the notional amount, or USD $0.07680 per notional dollar, of GDP Warrants—was well within the remaining Payment Cap, the third condition was satisfied.

### L.      Argentina's "Calculations" Supporting Its Decision in December 2014 Not To Make a Payment on the GDP Warrants Do Not Have Binding Effect.

101.      In December 2014, Argentina announced that "the 'growth rate' condition under the GDP-linked Securities was not met for 2013 and thus no payment was due."  (*Aurelius Capital Master, Ltd. v. The Republic of Argentina*, Case No. 19-cv-00351 (LAP) (S.D.N.Y.) ("*Aurelius*"), Defendant the Republic of Argentina's Memorandum of Law in Support of its Motion to Dismiss the Complaint ("Argentina MTD Brief"), ECF No. 17, at 2.)  Argentina did not disclose the "calculations" it used to make that determination.  Nonetheless, Argentina has contended before the United States District Court for the Southern District of New York that those "calculations" are entitled to deference under "binding effect" provisions in the Global Security contained in the definitions of Payment Amount and Excess GDP.  (*Id.* at 3, 8–10.) Argentina has represented: "The Global Security vests the Republic's Ministry of Economy with the power to make '[a]ll calculations' thereunder and to base those calculations exclusively on GDP data published by INDEC—'the only institution in Argentina with the statutory authority to produce official nationwide statistics'."  (*Id.* at 8.)

102.     The "binding effect" provisions do not give Argentina carte blanche to disregard the terms of the Governing Documents.  Argentina was required to calculate adjustments to Base Case GDP and Base Case GDP Growth when it re-based its GDP from 1993 to 2004 prices, using the ratio of 2013 Actual Real GDP in 1993 prices to 2013 Actual Real GDP in 2004 prices. (*See supra* ¶¶ 56–59; 71–75.)  The adjusted figures for Base Case GDP and Base Case GDP Growth are used to determine whether two of the conditions of payment have been met, and the adjusted figure for Base Case GDP is an input into the calculation of Excess GDP, which in turn is an input into the calculation of the ultimate payment amount.

103.     Argentina has admitted to this Court that it did not do the calculations necessary to adjust Base Case GDP and Base Case GDP Growth because INDEC did not publish 2013 Actual Real GDP in 1993 prices.  (*See* Argentina MTD Brief at 2 ("INDEC thus moved to constant 2004 prices, and, for that reason, 2012 was the last year INDEC calculated GDP in constant 1993 prices.") and 18 ("INDEC discontinued calculating real GDP in constant 1993 prices (one of the inputs in the formula [for calculating the Base Case GDP trigger]).")  Because the "binding effect" provisions apply to "calculations" and Argentina has admitted that it did not do the contractually required calculations to adjust Base Case GDP and Base Case GDP Growth, the "binding effect" provisions do not entitle Argentina to deference in its decision to evade payment.

104.     The "binding effect" provisions are also inapplicable because neither appears in the definition of Base Case GDP, which sets forth the adjustment calculations due to re-basing. Nor do they appear in Section 2(b) of the Global Security setting forth the three conditions for payment.

33

**M.     Argentina's "Calculations" in December 2014 Were Performed in Bad Faith and With a Dishonest Purpose and Yielded a Manifestly Erroneous Result.**

105.    Argentina's "calculations" in December 2014 purportedly supporting its declaration that no payment was due for Reference Year 2013 were performed in bad faith and with the dishonest purpose of avoiding a payment on the GDP Warrants. In doing so, Argentina engaged in willful misconduct that showed reckless disregard for the rights of investors in the GDP Warrants such as Plaintiff. Because Argentina (i) failed to adjust Base Case GDP to reflect the re-basing from 1993 to 2004 prices and then (ii) failed to recalculate the Base Case GDP Growth using the Base Case GDP numbers adjusted to 2004 prices, Argentina's "calculations" justifying its announcement in December 2014 that no payment was due were manifestly erroneous.

106.    INDEC's published EMAE Index during the second half of 2013 provided notice to Argentina and to holders of the GDP Warrants that a payment would be due for Reference Year 2013. In December 2013, INDEC published the EMAE Index for October 2013 (3.2%), and the aggregate growth for 2013 was estimated at 5.4%. In January 2014, the November EMAE Index was published (2.2%) and the aggregate growth for 2013 was estimated at 5.1%. Finally, in February 2014, INDEC published the EMAE Index for December 2013 (2.7%), and the aggregate growth for 2013 was revised to 4.91%. From February 2014, Argentina knew definitively that issuance of the Real GDP for 2013 in 1993 base prices would result in a payment being owed because 4.91% was far in excess of the 3.22% Base Case GDP Growth (in 1993 prices) for 2013. It also knew that it could not escape its payment obligation simply by re-basing because of the contractually required adjustments it was required to make to Base Case GDP and Base Case GDP Growth.

107.     Commentators at the time speculated that Argentina would use its decision to re-base from 1993 to 2004 prices as an improper maneuver to avoid paying holders of the GDP Warrants.  They were proven right.  Under the terms of the Global Security, Base Case GDP must be adjusted to reflect the re-basing from 1993 to 2004 prices.  Then, the Base Case GDP Growth rate must be re-calculated using the Base Case GDP numbers adjusted to 2004 prices.  In intentional, wrongful disregard of the terms of the Global Security, Argentina did not re-calculate the Base Case GDP Growth to reflect the re-basing.

108.     Argentina has disclosed in judicial filings that the its announcement in December 2014 was based on the conclusion that the "Republic's growth rate was 2.925%—below the 3.22% 'base case' specified in the Global Security for 2013."  (Argentina MTD Brief at 2.)  The 3.22% "base case" referenced by Argentina was calculated on the basis of 1993 base year prices, and does not reflect the effect of the re-basing to 2004 prices.  Thus, Argentina has judicially admitted that the December 2014 determination was made using an unadjusted Base Case GDP Growth number that *did not* account for the re-basing.

109.     If the Base Case GDP Growth had been properly adjusted, Argentina could not have concealed that a payment would have been due for Reference Year 2013 to the holders of the GDP Warrants.  Argentina's decision in December 2014 not to re-calculate Base Case GDP Growth to reflect the impact of the 2004 re-basing, and instead to continue to use the Base Case GDP Growth calculated using 1993 base year prices as the measure of whether a payment was due was also intended to deprive the holders of the GDP Warrants of a USD $1.3 billion payment for Reference Year 2013.  Argentina's decision not to adjust the Base Case GDP Growth rate was in breach of its obligations and was made in bad faith, was an act of willful misconduct, and generated a manifestly erroneous result.

110.    Indeed, Guillermo Nielsen, a former Argentine government official who was

Secretary of Finance of Argentina when the 2005 GDP Warrants were issued, wrote in March

2014 that such an adjustment was necessary and would result in a significantly lower Base Case

GDP Growth trigger for when a payment was due than the 3.22% implied by the unadjusted

figures for Base Case GDP in 1993 prices set forth in the Global Security.  He wrote:

> Without having all the technical information on the new GDP calculation—which
> would have been desirable—and leaving aside what we think about the quality of
> the INDEC data, it can be inferred that if the 2013 growth, calculated on the basis
> of the 1993 data, was 4.9%, and with the new 2012 and 2013 GDP data, the
> growth was 3%, *the "base case" with the new form of calculation would be
> approximately 1.38%, significantly lower than 3%.  In plain English, even with
> the change of base to 2004 . . . a 3% growth with the new GDP would lead to the
> coupon also having to be paid this year*.[6]

111.    Argentina further attempted to avoid the consequences of its bad faith disregard of

the contract's requirement by preventing INDEC from publishing 2013 Actual Real GDP in

1993 prices, one of the figures needed to make the proper adjustments to Base Case GDP and

Base Case GDP Growth as a result of the re-basing from 1993 to 2004 prices.  Under the Global

Security, investors were entitled to test Argentina's calculations to determine whether the

conditions for payment had been met by using published official data.  Argentina denied

investors that key benefit of the bargain by not permitting INDEC to publish Actual Real GDP

for 2013 in 1993 base prices.  It did so in bad faith and in an act of willful misconduct.

112.    That Argentina had the improper goal of preventing investor review of its

conclusion that no payment was due is underscored by its position in *Aurelius* that, absent the

official 2013 Actual Real GDP in 1993 prices, no investor can challenge its determination, even

using the EMAE Index which is also published by INDEC and which faithfully tracks real GDP.

---

[6] G. Nielsen & G. Rubinstein, To Pay or Not To Pay: The Coupon Dilemma, La Nacion, Mar. 31, 2014 (emphasis added).

113.    The harm to Plaintiff caused by Argentina's bad faith, willful misconduct remains unredressed.  On January 15, 2019, Mr. Nielsen was asked whether the USD $1.3 billion payment to holders of the GDP Warrants should be paid.  He responded: "Of course.  Plus interest and legal fees."[7]

## First Claim for Relief
### (Breach of Contract)

114.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 113.

115.    Under the terms of the 2005 GDP Warrants, defendant Argentina was contractually obligated to make a Payment Amount of at least USD $0.07680 per $1.00 of notional amount of GDP Warrants on December 15, 2014.

116.    Defendant Argentina breached its contractual obligations by failing to calculate the Payment Amount pursuant to the terms of the Governing Documents and to pay such amount when due in accordance with the terms of the Governing Documents.

117.    As a result of defendant Argentina's breach, Plaintiff is owed, and has suffered damages in an amount to be determined at trial, but not less than USD $37,947,421, including pre-judgment interest as of the date of this complaint.

## Second Claim for Relief
### (Breach of the Covenant of Good Faith and Fair Dealing, in the Alternative)

118.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 113.

119.    Argentina has claimed that because "[t]he binding effect clause entrusts" to the Ministry of Economy the judgment "as to how to address the discontinuance" of Actual Real GDP in 1993 prices, no holder of GDP Warrants can "'derive' their own calculation of the Republic's GDP" in order to challenge Argentina's conclusion that no payment was due. (*Aurelius,* Defendant the Republic of Argentina's Reply in Support of its Motion to Dismiss the

---

[7] R. Indart, Guillermo Nielsen: "Kicillof Was Completely Unaware of the Financial Rules," Perfil, Jan. 15, 2019.

Complaint, ECF No. 21, at 2.)  If this were correct, it would mean that Argentina could

unilaterally nullify its payment obligation by deciding not to publish data inputs required by the

Governing Documents, such as Actual Real GDP in 1993 prices, and avoid any liability for

doing so by claiming that it is exercising its judgment under the binding effect clauses.

120.     The Governing Documents implied a covenant of good faith and fair dealing in

the course of performance.  Pursuant to that covenant, Argentina pledged not to do anything that

would have the effect of destroying or injuring Plaintiff's right to receive the benefits of their

contract as set forth in the Governing Documents, including by frustrating Plaintiff's rights under

the Governing Documents, depriving Plaintiff of the value of the payments owed under the

Governing Documents, or benefiting itself at the expense of Plaintiff.

121.     Pursuant to the covenant of good faith and fair dealing implied in the Governing

Documents, Argentina was obligated to cause INDEC to publish 2013 full-year Actual Real

GDP in base-year 1993 prices in order to calculate the amount of a payment for Reference Year

2013 on its 2005 GDP Warrants and to enable Plaintiff to review that calculation for accuracy.

Argentina breached the covenant of good faith and fair dealing when it prevented INDEC from

publishing 2013 full-year Actual Real GDP in base-year 1993 prices, thus depriving Plaintiff of

the benefit of its bargain and benefiting itself by avoiding a payment to Plaintiff for Reference

Year 2013.  At the time of its breach, Argentina was aware, on the basis of the EMAE Index

published by INDEC, that a payment would be owed to Plaintiff for Reference Year 2013, and it

stopped INDEC from publishing the 2013 full-year Actual Real GDP in base-year 1993 prices

with the express aim of depriving Plaintiff of the payment to which it was entitled, and which

was the chief benefit of the parties' bargain.

122.    As a result of defendant Argentina's breach of the covenant of good faith and fair dealing, Plaintiff is owed, and has suffered damages in an amount to be determined at trial, but not less than USD $37,947,421, including pre-judgment interest, as of the date hereof.

### **Prayer for Relief**

WHEREFORE, Plaintiff requests the entry of judgment against defendant as follows:

(a)    Awarding Plaintiff damages equal to USD $37,947,421, together with additional pre-judgment interest after the date of this complaint and post-judgment interest, as applicable; and

(b)    Granting Plaintiff such other legal and equitable relief as the Court deems just and proper.

Date:    New York, New York
October 31, 2019

RICHARDS KIBBE & ORBE LLP

By: _____

Matthew M. Riccardi
*mriccardi@rkollp.com*
H. Rowan Gaither IV
*rgaither@rkollp.com*
Jacob Taber
*jtaber@rkollp.com*
200 Liberty Street
New York, NY 10281-1003
(212) 530-1800

*Attorneys for 683 Capital Partners, LP*