UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL MASTER, LTD.,

            Plaintiff,

            v.

THE REPUBLIC OF ARGENTINA,

            Defendant.

Case No.:  1:19-CV-0351 (LAP)

The Honorable Loretta A. Preska

**ORAL ARGUMENT REQUESTED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOVORIVER S.A.,

            Plaintiff,

            v.

ARGENTINE REPUBLIC,

            Defendant.

Case No.:  1:19-CV-09786 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ACP MASTER, LTD.,

            Plaintiff,

             v.

THE REPUBLIC OF ARGENTINA,

            Defendant.

Case No.:  1:19-CV-10109 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

683 CAPITAL PARTNERS, LP,

            Plaintiff,

             v.

THE REPUBLIC OF ARGENTINA,

            Defendant.

Case No.:  1:19-CV-10131 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADONA LLC, EGOZ I LLC, EGOZ II LLC, :
MASTERGEN, LLC, ERYTHRINA, LLC, :
AP 2016 1, LLC, AP 2014 3A, LLC, AP :
2014 2, LLC, AND WASO HOLDING :
CORPORATION, :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　Plaintiffs, :　　Case No.:  1:19-CV-11338 (LAP)
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　v. :
　　　　　　　　　　　　　　　　　　　　　 :
THE REPUBLIC OF ARGENTINA, :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　Defendant. :
　　　　　　　　　　　　　　　　　　　　　 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT THE REPUBLIC OF ARGENTINA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINTS

Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White
Jason E. Kornmehl
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:   (212) 558-4000
Facsimile:    (212) 558-3588

*Counsel for The Republic of Argentina*

June 8, 2020

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................1

**BACKGROUND** ....................................................................................................5

    A.    The Parties .................................................................................................5

    B.    The Republic's GDP-Linked Securities.................................................6

    C.    The Ministry of Economy's Exclusive Authority Over "All" GDP-Related "Calculations" Based on INDEC Data ......................................7

    D.    INDEC's Change of the Year of Base Prices After IMF Urging ...........9

    E.    This Court's January 7, 2020 Decision................................................11

    F.    Plaintiffs' Amended Complaints..........................................................11

**ARGUMENT** ......................................................................................................13

**I.**    **AS THIS COURT HAS HELD, PLAINTIFFS' USE OF "APPROXIMATED" DATA FOR THEIR CALCULATION OF THE REPUBLIC'S REAL GDP REQUIRES DISMISSAL OF THEIR AMENDED COMPLAINTS** ........................13

**II.**    **THE COURT SHOULD ALSO REJECT PLAINTIFFS' LEGALLY FLAWED IMPLIED OBLIGATION AND DUTY OF GOOD FAITH THEORIES**................................................................................................14

    A.    The Amended Complaints Plead No Basis for This Court to Find an "Implied" Obligation for Argentina to Cause INDEC to Publish Actual Real GDP in 1993 Prices.....................................................15

    B.    Plaintiffs' Claims for Breach of the Implied Duty of Good Faith and Fair Dealing Fail as a Matter of Law ..........................................19

        1.    The Amended Complaints' Conclusory and Implausible Allegations Fail to Meet Rule 9(b)'s Heightened Pleading Requirements ..................20

        2.    Judicially Noticeable Facts Contradict Plaintiffs' Speculative Conspiracy Theory.....................................................................24

**III.**    **PLAINTIFFS CANNOT ESCAPE THE BINDING EFFECT CLAUSE, WHICH INDEPENDENTLY COMPELS DISMISSAL OF THEIR AMENDED COMPLAINTS**........................................................................26

**CONCLUSION** ...................................................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*2138747 Ontario, Inc.* v. *Samsung C & T Corp.*,
  103 N.E.3d 774 (N.Y. 2018)...................................................................2, 15

*ACE Sec. Corp.* v. *DB Structured Prod., Inc.*,
  36 N.E.3d 623 (N.Y. 2015)....................................................................2, 15

*Acito* v. *IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ..........................................................................22

*Airport Mart Inc.* v. *Dunkin' Donuts Franchising LLC*,
  2019 WL 4413052 (S.D.N.Y. Sept. 16, 2019)...........................................20

*Antero Res. Corp.* v. *S. Jersey Res. Grp., LLC*,
  933 F.3d 1209 (10th Cir. 2019) .................................................................21

*Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*,
  2020 WL 70348 (S.D.N.Y. Jan. 7, 2020) ......................................... *passim*

*Benfante* v. *Com. Ins. Co. of Newark, N.J.*,
  162 N.Y.S.2d 715 (N.Y. Sup. Ct. 1957) .................................................2, 18

*CCM Rochester, Inc.* v. *Federated Inv'rs, Inc.*,
  2014 WL 6674480 (S.D.N.Y. Nov. 25, 2014).........................................15, 16

*CE Int'l Res. Holdings, LLC* v. *S.A. Minerals Ltd. P'ship*,
  2013 WL 2661037 (S.D.N.Y. June 12, 2013) ..........................................3, 18

*Chleck* v. *Gen. Elec. Co.*,
  2004 WL 2375803 (S.D.N.Y. Oct. 22, 2004) ..............................................28

*CIBC Bank & Tr. Co. (Cayman)* v. *Banco Cent. do Brasil*,
  886 F. Supp. 1105 (S.D.N.Y. 1995).......................................................16, 17

*Cifarelli* v. *Vill. of Babylon*,
  93 F.3d 47 (2d Cir. 1996) ..........................................................................27

*De Jesus* v. *Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996) ..........................................................................30

*DeBlasio* v. *Merrill Lynch & Co., Inc.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ..............................................20

*Duran* v. *Henkel of Am., Inc.*,
   2020 WL 1503456 (S.D.N.Y. Mar. 30, 2020) ...........................................................4, 24, 25

*Fernandez* v. *UBS AG*,
   222 F. Supp. 3d 358 (S.D.N.Y. 2016).......................................................................20

*First Equity Corp. of Fla.* v. *Standard & Poor's Corp.*,
   690 F. Supp. 256 (S.D.N.Y. 1988)...........................................................................21

*Ganley* v. *City of New York*,
   734 Fed. App'x 784 (2d Cir. 2018)...........................................................................30

*Hayden* v. *Feldman*,
   753 F. Supp. 116 (S.D.N.Y. 1990)...........................................................................21

*In re Irving*,
   1979 WL 15482 (2d Cir. Apr. 12, 1979) ..............................................................21, 29

*Jus Punjabi, LLC* v. *Get Punjabi US, Inc.*,
   640 Fed. App'x 56 (2d Cir. 2016)..........................................................................3, 21

*Lightwater Corp. Ltd.* v. *Republic of Argentina*,
   2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003)..............................................................6

*Meserole* v. *Sony Corp. of Am., Inc.*,
   2009 WL 1403933 (S.D.N.Y. May 18, 2009) .......................................................20

*Neuman* v. *Pike*,
   591 F.2d 191 (2d Cir. 1979)....................................................................................19

*Odyssey Re (London) Ltd.* v. *Stirling Cooke Brown Holdings Ltd.*,
   85 F. Supp. 2d 282 (S.D.N.Y. 2000).........................................................................24

*In re Oi Brasil Holdings Coöperatief U.A.*,
   578 B.R. 169 (Bankr. S.D.N.Y. 2017) .......................................................................5

*Onondaga Nation* v. *New York*,
   500 Fed. App'x 87 (2d Cir. 2012)..............................................................................22

*Optionality Consulting Pte. Ltd.* v. *Nekos*,
   2019 WL 4523469 (S.D.N.Y. Sept. 18, 2019)........................................................3, 22

*Powers* v. *British Vita, P.L.C.*,
   57 F.3d 176 (2d Cir. 1995)........................................................................................24

*Rogers Revocable Tr.* v. *Bank of Am., N.A.*,
   2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct. Nov. 13, 2008) .............................26, 27, 28, 29

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004).............................................................................20

*Rowe* v. *Great Atl. & Pac. Tea Co.*,
    385 N.E.2d 566 (N.Y. 1978).....................................................................15, 17

*Sec. Plans, Inc.* v. *CUNA Mut. Ins. Soc.*,
    769 F.3d 807 (2d Cir. 2014).............................................................................19

*Sempra Energy Trading Corp.* v. *BP Prods. N. Am., Inc.*,
    860 N.Y.S.2d 71 (1st Dep't 2008)...................................................................28

*Structured Credit Partners, LLC* v. *PaineWebber Inc.*,
    No. 602112/2001 (N.Y. Sup. Ct. July 2, 2002) ..............................................27

*Taylor Precision Prods., Inc.* v. *Larimer Grp., Inc.*,
    2018 WL 4278286 (S.D.N.Y. Mar. 26, 2018) ................................................28

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................25, 26

*Toledo Fund, LLC* v. *HSBC Bank USA, Nat'l Ass'n*,
    2012 WL 2850997 (S.D.N.Y. July 9, 2012) ...................................................27

*Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007)...............................................................................19

*In re Tribune Media Co.*,
    799 F.3d 272 (3d Cir. 2015)...............................................................................5

*United States* v. *Ross*,
    302 F.2d 831 (2d Cir. 1962).............................................................................19

*Versatile Housewares & Gardening Sys., Inc.* v. *Thill Logistics, Inc.*,
    819 F. Supp. 2d 230 (S.D.N.Y. 2011)..............................................................27

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)........................................................................28

Fed. R. Civ. P. 9 ............................................................................................................20

Fed. R. Civ. P. 44.1 .......................................................................................................18

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, the Republic of Argentina (the "Republic" or "Argentina") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Amended Complaints (the "Amended Complaints" or "AC") with prejudice.[1]

## PRELIMINARY STATEMENT

Plaintiffs—hedge funds and other sophisticated investors—claim that they are owed additional money under Argentina's GDP-linked Securities based on their own, unofficial calculations of the Republic's real GDP. But Plaintiffs' alternative calculations suffer from the same legal defect that doomed the *Aurelius* complaint that this Court correctly dismissed on January 7, 2020. Specifically, the securities require the use of GDP data published by Argentina's national statistical agency ("INDEC"), but in March 2014, INDEC discontinued calculating and publishing Argentina's real GDP in constant 1993 prices for the year 2013 onward and began calculating and publishing real GDP in constant 2004 prices. To get around INDEC's change to its method of calculating Argentina's real GDP, Plaintiffs ask the Court to apply their own made-up calculation of the Republic's real GDP, instead of the "data prescribed by the terms of the securities' governing documents." *Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*, 2020 WL 70348, at *1, 7 (S.D.N.Y. Jan. 7, 2020). Because Plaintiffs' claim to additional money under Argentina's GDP-linked Securities, as in the dismissed *Aurelius* complaint, continues to turn on "alternate statistics not contemplated by the global securities' plain terms," *id*. at *7, the Court should dismiss the Amended Complaints—this time with prejudice.

---

[1]    Plaintiffs are Aurelius Capital Master, Ltd. ("Aurelius"); ACP Master, Ltd. ("ACP Master"); Novoriver S.A. ("Novoriver"); 683 Capital Partners, LP ("683 Capital"); Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC AP 2014 2, LLC, and WASO Holding Corporation (together, "Adona").

To save their Amended Complaints, Plaintiffs rely on two flawed theories.  *First*, Plaintiffs ask the Court to "interpret" the governing document, the Global Security, as containing an implied covenant for INDEC to continue publishing Argentina's real GDP in 1993 prices.  But this Court has already recognized that "the Republic was under no explicit contractual obligation" to continue to calculate and then publish this figure.  *Id.* at *7 n.7.  New York courts are "extremely reluctant to interpret an agreement as impliedly stating something," *ACE Sec. Corp.* v. *DB Structured Prod.*, *Inc.*, 36 N.E.3d 623, 630 (N.Y. 2015), particularly in a contract involving, as here, "sophisticated, counseled business people."  *2138747 Ontario, Inc.* v. *Samsung C & T Corp.*, 103 N.E.3d 774, 780 (N.Y. 2018).  Plaintiffs offer no reason to depart from this settled law.

Moreover, Plaintiffs' entreaty for the Court to impose a new obligation on the Republic and INDEC runs contrary to the terms of the Global Security and Argentine law. Plaintiffs ask the Court to find an implied obligation for Argentina's political branches to "cause[] INDEC to publish" real GDP data in 1993 prices.  (*E.g.*, Aurelius AC ¶ 70.)  But the Global Security expressly distinguishes between (i) the Ministry of Economy's rights and obligations in performing calculations relating to payment thereunder, and (ii) INDEC's role as the developer and publisher of GDP data used as an input to those calculations.  The Global Security places no obligations on INDEC whatsoever, and Argentine law grants INDEC alone the statutory authority to produce official nationwide statistics and provides for INDEC's independence from the political branches with respect to statistical and technical matters.  (*See infra* pp. 17-19.)  Under Argentine law, a wide array of Argentine entities, including the Ministry of Economy, provincial governments, and private organizations, rely on INDEC statistics.  (*Id.*)  The terms of the Global Security must be understood in light of this statutory background, *see Benfante* v. *Com. Ins. Co. of Newark, N.J.*, 162 N.Y.S.2d 715, 717-18 (N.Y. Sup. Ct. 1957), and New York courts should not

encroach on the Republic's sovereignty by implying a contractual obligation that would require INDEC to publish certain statistics.  *See CE Int'l Res. Holdings, LLC* v. *S.A. Minerals Ltd. P'ship*, 2013 WL 2661037, at *18 (S.D.N.Y. June 12, 2013) (Netburn, J.) ("[A] New York court should not encroach upon another nation's sovereignty by requiring citizens to take actions within their home country that would contravene that country's laws.").

   *Second*, Plaintiffs try to plead a breach of the implied covenant of good faith and fair dealing by speculating that Argentina's executive branch, in late 2013, foresaw that a payment would be due under the GDP-linked Securities in December 2014 and then set out to deliberately "stymie" holders by directing INDEC to change how it calculated the Republic's real GDP.  (*See, e.g.*, Aurelius AC ¶¶ 5, 13.)  Plaintiffs' threadbare allegations fall far short of meeting Rule 9(b)'s heightened pleading standards.

   Plaintiffs do not even *identify* a specific person in the Republic's entire government who engaged in the supposed misconduct, let alone plead facts giving rise to a "strong inference" that this unnamed official intended to defraud holders.  *See Jus Punjabi, LLC* v. *Get Punjabi US, Inc.*, 640 Fed. App'x 56, 58 (2d Cir. 2016) (Plaintiff must "plead those events which give rise to a strong inference that . . . defendant[s] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.").  Instead, Plaintiffs speculate that unnamed persons in the Republic's national government sought in March 2014 to avoid paying holders of GDP-linked Securities by changing INDEC's GDP methodology (*e.g.*, 683 Cap. AC ¶ 7), but this conclusory allegation is legally insufficient to plead fraud because generalized allegations that "defendants stand to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)."  *Optionality Consulting Pte. Ltd.* v. *Nekos*, 2019 WL 4523469, at *11 (S.D.N.Y. Sept. 18, 2019) (Carter, J.).

Judicially noticeable facts confirm that INDEC's March 2014 decision to move away from constant 1993 prices had nothing to do with these securities at all.  As this Court recognized, in February 2013—over a year before INDEC's decision to move away from using constant 1993 prices in calculating real GDP—INDEC was *already* in the middle of conducting an "extensive," more than three-year study into rebasing its method of calculating Argentina's GDP.  *Aurelius*, 2020 WL 70348 at *4.  Publicly available documents show that the International Monetary Fund ("IMF") pressed the Republic to complete the process no later than March 31, 2014.  (*See infra* pp. 24-26.)

In considering whether Plaintiffs have met Rule 9(b)'s heightened pleading standards, the Court must "take into account plausible opposing inferences."  *Duran* v. *Henkel of Am., Inc.*, 2020 WL 1503456, at *9 (S.D.N.Y. Mar. 30, 2020) (Engelmayer, J.).  Here, the far more compelling inference is that INDEC discontinued using 1993 prices as a result of the implementation of a process—commenced more than three years earlier and urged by the IMF—of revamping the Republic's national economic statistics, as opposed to some nefarious reason to cheat holders of these securities.

*Finally*, the Court should dismiss the Amended Complaints for the independent reason that the Global Security's "binding effect" clause bars Plaintiffs' alternative calculations of their "Payment Amount."  Section 1(e) expressly provides that "*[a]ll calculations* made by the Ministry of Economy . . . shall be binding on . . .  all Holders of this Security, absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy."  (Aurelius AC Ex. B (2005 Global Security), § 1(e) at R-4 (emphasis added).)  This provision is essential to a workable security, because it ensures uniformity and prevents holders from devising alternate calculations using "doppelgänger" inputs that are only "superficially similar to the calculations

specified in the Global Security." *Aurelius*, 2020 WL 70348, at *7.  Because Plaintiffs do not plausibly plead that, in exercising its responsibility to make the relevant calculation, the Ministry of Economy acted in "bad faith" or engaged in "willful misconduct" or manifest error, the Ministry's calculation controls under the binding effect clause.

## BACKGROUND

### A.    The Parties

Argentina is home to approximately 44 million people and has a longstanding relationship with the United States.  (*Aurelius Cap. Master Ltd.* v. *Republic of Argentina*, 1-19-Civ-0351 ("*Aurelius* Dkt.") No. 16-1 (2017 18-K), at D-20.)  In 2016, after more than a decade of litigation with holders of Argentine bonds, the Republic executed a global settlement with "holdout" creditors.  (*Id*. at D-6.)

Plaintiffs Aurelius and its affiliate ACP Master are hedge funds "specializing in [acquiring] distressed debt" through "the secondary debt market in the United States."  *In re Tribune Media Co.*, 799 F.3d 272, 275 (3d Cir. 2015); *Rubin* v. *Islamic Republic of Iran*, No. 11-431, 2011 WL 5402978, at *1 (U.S. Nov. 7, 2011).  Courts have "refuse[d] to countenance" their litigation tactics.  *See, e.g., In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 242-43 (Bankr. S.D.N.Y. 2017) (Lane, J.) (describing how Aurelius "weaponized" American bankruptcy law).  Aurelius was a long-time "holdout" creditor on pre-crisis Argentina bonds before settling its disputes in 2016.  Of the five Plaintiffs here, Aurelius and ACP Master are the largest holders of the GDP-linked Securities, although they do not say when they acquired their securities or whether they acquired these securities solely to pursue these claims.  (*See* Aurelius AC ¶ 16; ACP Master AC ¶ 16.)  Plaintiffs Novoriver, 683 Capital, and Adona are also sophisticated investment

funds; they also do not plead when they acquired their securities or whether they acquired them solely to pursue these claims.[2]

**B.     The Republic's GDP-Linked Securities**

As this Court knows, by late 2001, Argentina had entered the "worst economic crisis in its history." *Lightwater Corp. Ltd.* v. *Republic of Argentina*, 2003 WL 1878420, at *2 (S.D.N.Y. Apr. 14, 2003) (Griesa, J.).  Because there is no bankruptcy regime for sovereign issuers, the Republic—which was insolvent—declared in December 2001 that it would defer interest and principal payments to its bondholders, while at the same time pursuing an equitable debt restructuring.  *See id.*  To try to resolve the ensuing widespread litigation in a way that gave Argentina a chance to return to solvency, the Republic launched a voluntary debt exchange in January 2005 (the "2005 Exchange").   This exchange involved trading in non-performing securities (which encompassed 152 different bonds, originally issued in 14 different currencies) for three different types of securities (2033 Discount Bounds; 2038 Par Bonds; and 2045 Quasi-Par Bonds). (*Aurelius* Dkt. No. 16-1 (2017 18-K) at D-150.)  Approximately 76% of the aggregate value of eligible securities was exchanged under these terms.  (*Aurelius* Dkt. No. 16-5 (2011 18-K) at 16.)  The Republic launched a similar exchange in 2010 (the "2010 Exchange"), which raised the participation rate to over 91% of eligible securities.  (*Id.* at 17.)

In addition to the three types of bonds described above, the 2005 and 2010 Exchanges included what Aurelius described as a "sweetener bonus"—the GDP-linked

---

[2]     Adona LLC, Egoz I LLC, and Egoz II LLC were incorporated in November 2019, ten months *after* Aurelius filed its original complaint and less than three weeks *before* filing their action against the Republic.     *See Del. Dep't of State, Division of Corporations*, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.     Mastergen, LLC and Erythrina, LLC were also incorporated *after* Aurelius filed its original complaint.  *See id.*

Securities.[3]  The GDP-linked Securities "were viewed by Argentina's creditors, as well as by the financial markets, as having very little value." (*Aurelius* Dkt. No. 16-7 (Griffith-Jones & Hertova) at 35.)  The GDP-linked Securities were intended to provide participants in the 2005 and 2010 Exchanges the opportunity to "participat[e] in the ensuing growth of Argentina's economy." (Aurelius AC ¶ 2; ACP Master AC ¶ 2.)

Under the Global Security, a "Payment Amount" is due for a given calendar year (or "Reference Year") if:  (i) Actual Real GDP exceeds a "base case" GDP for the relevant Reference Year; (ii) Actual Real GDP Growth exceeds a base case GDP growth for the Reference Year; and (iii) the total payments made to date under the GDP-Linked Securities and the Payment Amount do not exceed a contractually defined "Payment Cap."  (Aurelius AC Ex. B (2005 Global Security), § 1(e) at R-4.)  These conditions ensure that the Republic would make payments only if the nation is wealthy enough (as measured by its real GDP) and is growing at a healthy rate (as measured by its real GDP growth rate).  The Global Security provides for a rate of at least 3% as a "base case" for GDP growth.  (Aurelius AC Ex. B (2005 Global Security), § 1(e) at R-3.)  The Republic's June 2004 SEC filing describing the terms of the GDP-linked Securities for the 2005 Exchange Offer also reflected a 3% growth rate as the "Payment trigger." (*Aurelius* Dkt. No. 16-10 (2004 18-K/A) at Annex D.)

## C.   The Ministry of Economy's Exclusive Authority Over "All" GDP-Related "Calculations" Based on INDEC Data

The Global Security vests the Republic's Ministry of Economy with the power to make "all" of the GDP-linked Securities calculations:  "***All*** *calculations* made by the Ministry of Economy hereunder ***shall be*** *binding on . . . all Holders of this Security,* ***absent bad faith, willful***

---

[3]      *See NML Cap., Ltd.* v. *Republic of Argentina*, No. 12-105, Dkt. No. 820, at 48 (2d Cir. Jan. 25, 2013).

***misconduct or manifest error*** on the part of the Ministry of Economy."  (Aurelius AC Ex. B (2005

Global Security), § 1(e) at R-4 (emphasis added)); *see Aurelius*, 2020 WL 70348, at *6 & n.5.  The

Global Security also mandates that the Ministry of Economy's calculations be based on the "gross

domestic product of Argentina . . . as published by INDEC."  (Aurelius AC Ex. B (2005 Global

Security), § 1(e) at R-2.)

   INDEC is the "agency officially responsible for publishing [Argentina's] economic

data."  *Aurelius*, 2020 WL 70348, at *3.  Under Argentine law, INDEC has the *exclusive* authority

to "[e]stablish the methodological rules" for calculating government statistics and to "[p]romot[e]

the proper dissemination of all . . . statistical information to the Ministries, Commanders in Chief,

State Secretariats, provincial and local governments, public and private organizations, and the

population at large."  (Ex. 1 (Law No. 17622), § 5(c), (f).)[4]  Beyond a statutory requirement that

INDEC maintain the confidentiality of data collected for statistical purposes, INDEC has broad

discretion in formulating its technical policymaking decisions, which are not subject to review by

any other government agency.  (*Id.* §§ 5, 10, 13, 17; Ex. 2 (Treasury Opinion Vol. 168, p. 300).)

   In keeping with Argentine law, the Global Security respects INDEC's technical

independence and distinguishes between the Ministry of Economy (which has the contractual

responsibility for performing "all" calculations for any "Payment Amount") and INDEC (which

has no contractual obligations under the Global Security but the Ministry of Economy must use

---

[4]  References to "Ex." are to exhibits accompanying the Declaration of Robert J. Giuffra, Jr. This Court "can take judicial notice of SEC filings" as well as the Republic's public statements and other governmental publications, including IMF publications, on this Rule 12(b)(6) motion. *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 n.3 (S.D.N.Y. 2012) (Crotty, J.); *see, e.g.*, *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 376 n. 22 (S.D.N.Y. 2007) (Scheindlin, J.) (taking judicial notice of IMF "Coordinated Portfolio Investment Survey Guide"). The Court can also take judicial notice of foreign law.  *See Wiwa* v. *Royal Dutch Petroleum Co.*, 2002 WL 319887, at *17 n.21 (S.D.N.Y. Feb. 28, 2002) (Wood, J.) (taking judicial notice of a Nigerian statute on a motion to dismiss).

INDEC's data to perform its calculations).  (*See* Aurelius AC Ex. B (2005 Global Security) § 1(e) at R-2, R-4, R-5.)

Since their inception in 2005, the Republic has paid nearly $10 billion to holders of GDP-linked Securities (*see Aurelius* Dkt. No. 16-7 (Griffith-Jones & Hertova) at 36), and prior to 2013, paid holders each year except 2009 and 2012 (when the Republic's growth rate was below the applicable triggers) (*see* Aurelius AC ¶ 3; Novoriver AC ¶ 3):

| Reference Year | Real GDP Growth * | Payment Amount** | Reference Year | Real GDP Growth * | Payment Amount** |
|---|---|---|---|---|---|
| 2005 | 9.179% | $395,426,918 | 2010 | 9.161% | $2,478,655,114 |
| 2006 | 8.466% | $810,888,443 | 2011 | 8.870% | $3,535,530,707 |
| 2007 | 8.653% | $1,300,053,094 | 2012 | 1.900% | No Payment |
| 2008 | 6.758% | $1,420,152,532 | 2013 | 2.925% | No Payment |
| 2009 | 0.850% | No Payment | | | |

\* *See* Aurelius AC ¶ 49 & Ex. F; *Aurelius* Dkt. No. 16-19 (INDEC, GDP Growth in 1993 Prices).

\*\* *Aurelius* Dkt. Nos. 16-20–16-25 (Ministry of Economy Press Releases); *Aurelius* Dkt. No. 16-7 (Griffith-Jones & Hertova) at 36.

### D.    INDEC's Change of the Year of Base Prices After IMF Urging

The IMF provided $22 billion in financial support to the Republic during its financial crisis (Ex. 3 (IEO) at 5) and scrutinized Argentina's statistical reporting and accounting throughout the period at issue here.  In February 2012, the IMF called on the Republic to implement "remedial measures" to address the quality of its official data, including GDP data, to comply with the IMF Articles of Agreement's provisions concerning national statistical data. (Ex. 4 (IMF Feb. 2012 Press Release).)  As of the IMF's February 2012 decision, INDEC had already begun an "extensive," more than three-year study of statistical data that included preparing

to change the year of base prices used to measure the Republic's real GDP.  *Aurelius*, 2020 WL 70348, at *4; Ex. 5 (INDEC Mar. 2014 Press Release).

In September 2012, the IMF called on Argentina to provide a timetable for implementing the remedial measures with respect to GDP.  (*See* Ex. 6 (Nov. 2013 IMF Rep.) at 12.)  In February 2013, the IMF specifically asked the Republic to adopt a revised set of remedial measures by no later than September 29, 2013.  (Ex. 7 (IMF Feb. 2013 Press Release).)  The revisions included "updat[ing], *as a matter of priority*, the . . . 1993 base year of the national accounts using information from the 2004 Economic Census and other comprehensive sources" (Ex. 6 (Nov. 2013 IMF Rep.) at 1, 14 (emphasis added)).[5]

In August 2013, Argentina provided the IMF "an updated work schedule" that envisioned that "revised GDP data (with an updated base year) will be published by March 2014." (*See* Ex. 6 (Nov. 2013 IMF Rep.) at 1, 15; *see also* Novoriver AC ¶ 65 (noting September 2013 announcement of intention to adopt new Year of Base Prices).)   In December 2013, the IMF formally called upon Argentina to release, by March 31, 2014, "revised GDP data with an updated base year for the fourth quarter of 2013 and as far back as feasible."  (Ex. 9 (Dec. 2013 IMF Decision) at 3.)[6]

---

[5]     Numerous intergovernmental organizations, including the IMF, recommend that countries periodically rebase their GDP because, over time, prices in the base period tend to become "progressively less relevant . . . to the point where it becomes unacceptable to continue using them."  (*Aurelius* Dkt. 16-27 (System of National Accounts 2008) at 299; *see* Ex. 8 (IMF 2019 Annual Rep.) at 62 ("The IMF Statistics Department advises member countries to rebase their GDP every five years in line with international standards, or more often when there are important new economic developments").)

[6]     *See also* Ex. 10 (IMF May 23, 2014 Transcript of Press Briefing) ("[In] December 2013 our Executive Board adopted a decision calling on Argentina to implement an initial set of specified actions including public release of . . . revised GDP estimates by end of March 2014.").

In March 2014, INDEC announced that it was replacing its calculation of real GDP in constant 1993 prices and, effective for the calendar year 2013, would base its real GDP figures on constant 2004 prices. *Aurelius*, 2020 WL 70348, at *4. Consistent with international guidance recommending that countries discontinue calculating "obsolete" data, INDEC discontinued calculating the Republic's real GDP in constant 1993 prices upon implementing 2004 as the new base year. *See id.* (Ex. 11 (UN, *Analysis - Rebasing GDP of Kenya*) at 2, 17.) Nine months later, on December 12, 2014, Argentina's Ministry of Economy announced that no payment was due under the GDP-linked Securities for 2013, because the "growth rate" condition for payment was not satisfied. (*Aurelius* Dkt. No. 16-32 (Ministry of Economy Press Release (Dec. 12, 2014)).)

### E.   This Court's January 7, 2020 Decision

In January 2019, more than four years *after* the Republic's announcement that no payment was due for Reference Year 2013, Aurelius filed a complaint alleging a breach of the Global Security. Aurelius's theory rested entirely on its own GDP calculations, using "the EMAE Index"—not an actual measure of GDP, but an index of how economic activity changes—"as a vehicle for calculating the Republic's 2013 Actual Real GDP in constant 1993 prices," given that INDEC did not calculate or publish this figure. *Aurelius*, 2020 WL 70348, at *5.

On January 7, 2020, in dismissing Aurelius's complaint, this Court rejected Aurelius's use of "alternate statistics." *Id.* at *7. This Court held that Aurelius's use of "alternate, approximated inputs" and "its version of the Republic's 2013 Actual Real GDP" contravened the Global Security's plain terms, which require "a version of the Republic's [GDP] that is published by INDEC." *Id.* at *5, 7. The Court explained that Aurelius's calculations were only "superficially similar to the calculations specified in the Global Security," and that Aurelius's "doppelgänger versions of Base Case GDP and Base Case Growth" could not "stand in the place of the real thing under the plain terms of the contract." *Id.* at *7. The Court rightly recognized INDEC's discretion

under the Global Security to "elect to change the Year of Base Prices" and explained that "Aurelius could have bargained for language that provided flexibility where INDEC fails to publish Actual Real GDP data," but that it "did not do so." *Id.* at *3, 7.  Accordingly, Aurelius was "stuck with the enumerated metrics" in the Global Security and could not use "alternate statistics not contemplated by the Global Security's plain terms." *Id*. at *1, 7.

This Court also held that "the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices and thus maintained significant discretion under the terms of the Global Security to rebase its GDP," but left open the possibility that, in an amended complaint, Aurelius might be able to plead that the Republic "destroy[ed] or injur[ed] the right of [Aurelius] to receive the fruits of the contract," by "rebasing its GDP in a manner intentioned to avoid triggering its payment obligations." *Id.* at *7-8 n.7.

### F.    Plaintiffs' Amended Complaints

In the fall of 2019, ACP Master, Novoriver, 683 Capital, and Adona filed copycat complaints against the Republic seeking payment for the 2013 Reference Year.  Novoriver, 683 Capital, and Adona alleged in conclusory fashion that the Republic had acted in bad faith in failing to make a payment for 2013 and subsequently stipulated to stay their cases pending the outcome of the Court's decision in *Aurelius*.

On January 30, 2020, the Court entered a stipulation and order (i) permitting Aurelius to file an amended complaint by March 9, 2020 in light of the Court's January 7 decision, and (ii) giving ACP Master, Novoriver, 683 Capital, and Adona the opportunity to evaluate Aurelius's amended complaint and to file their own amended complaints by March 23, 2020. (*Aurelius* Dkt. No. 27.)  Plaintiffs' Amended Complaints share large swaths of identical language and assert identical legal theories, namely, that there is an implied obligation that "Argentina

ensure the publication of" 2013 Actual Real GDP in 1993 prices until 2035, and alternatively, that the Republic breached the covenant of good faith and fair dealing by causing INDEC to stop publishing this data.  (*See, e.g.*, Aurelius AC ¶¶ 11-13.)

## ARGUMENT

**I.  AS THIS COURT HAS HELD, PLAINTIFFS' USE OF "APPROXIMATED" DATA FOR THEIR CALCULATION OF THE REPUBLIC'S REAL GDP REQUIRES DISMISSAL OF THEIR AMENDED COMPLAINTS.**

In its January 7 decision, this Court correctly held that the plain language of the Global Security "unequivocally" requires calculations based on "the gross domestic product of Argentina . . . as published by INDEC"—not alternative sources.  *Aurelius*, 2020 WL 70348, at *3, 7.  The parties agreed in the Global Security to bind themselves exclusively to INDEC-supplied GDP figures.  As Plaintiffs concede, GDP can be "presented in a number of different formats," and calculating GDP involves subjective judgments, including how to "assign relative weights to the economic output generated by various sectors" of a country's economy.  (Adona AC ¶¶ 41, 45; *see* 683 AC ¶ 37.)[7]

Despite this Court's January 7 decision—and ample opportunity to amend their pleadings—Plaintiffs have doubled down on the notion that they should not be tied, as provided in the Global Security, to INDEC GDP figures.  All Plaintiffs concede that their own alternative

---

[7]    In calculating GDP, the country must first choose from among three accepted methodologies for measuring GDP (the "income," "expenditures," and "value-added" approaches).  (*Aurelius* Dkt. No. 16-11 (United States Bureau of Economic Analysis, *Measuring the Economy: A Primer on GDP and the National Income and Product Accounts*), at 3-4.)  Next, the country must select the sources of data it will use (including potentially other governmental entities and private industry) and "fill [any] gaps" as it sees fit.  (*Aurelius* Dkt. No. 16-12 (United States Bureau of Economic Analysis, *The Making of GDP*).)  The country must then assign weights to that data.  (*Aurelius* Dkt. No. 16-13 (Steindel), at 1; *Aurelius* Dkt. No. 16-14 (Motley), at 3-4, 6.)  All of these decisions "involve[] subjective judgments about what to include and how to weight different components."  (*Aurelius* Dkt. No. 16-15 (Kubiszewski et al.), at 58.)

calculations are based on *estimated* GDP figures "derived" from the EMAE Index.  (*See* Aurelius AC ¶ 43 ("The figure for Actual Real GDP for 2013 in 1993 prices is derived using the EMAE Index."); *see also* ACP Master AC ¶ 43; Novoriver AC ¶ 45; 683 Cap. AC ¶ 83; Adona AC ¶ 97.) But this Court specifically rejected this approach.  The Court held that Plaintiffs' calculations using the EMAE Index are, at best, "superficially similar" to the INDEC-based figures required under the Global Security and result in "doppelgänger versions of Base Case GDP and Base Case Growth [that] have different component parts" from those required by the Global Security, and "thus cannot stand in the place of the real thing under the plain terms of the contract."  *Aurelius*, 2020 WL 70348, at *7.

Thus, for the same reason as Aurelius's original complaint, this Court should dismiss the Amended Complaints—this time, with prejudice.  The parties agreed that INDEC alone is the exclusive source of the governing GDP figures (Aurelius AC Ex. B (2005 Global Security), § 1(e) at R-2), and that the Ministry of Economy, as the calculation agent, would be responsible for addressing issues related to the calculations required in the operation of the Global Security (Aurelius AC Ex. B (2005 Global Security) §1(e) at R-4).  As this Court has already held, Plaintiffs "could have bargained for language that provided flexibility where INDEC fails to publish Actual Real GDP data," but—fatally for their Amended Complaints—Plaintiffs "did not do so."  *Aurelius*, 2020 WL 70348, at *3, 7.

## II.   THE COURT SHOULD ALSO REJECT PLAINTIFFS' LEGALLY FLAWED IMPLIED OBLIGATION AND DUTY OF GOOD FAITH THEORIES.

To try to get around the Court's January 7 decision barring their use of "alternate statistics not contemplated by the Global Security's plain terms," *Aurelius*, 2020 WL 70348, at *7, Plaintiffs advance two flawed legal theories:  (i) this Court should "interpret" the Global Security to contain an "implied" obligation for Argentina to cause INDEC to continue publishing the 1993

real GDP figures; and (ii) Argentina's failure to cause INDEC to publish the 1993 data somehow breached the implied covenant of good faith and fair dealing to be read into the Global Security. (*See* Aurelius AC ¶¶ 12-13; ACP Master AC ¶¶ 12-13; Novoriver AC ¶¶ 13, 15; 683 Cap. AC ¶ 17; Adona AC ¶¶ 16, 18.)  Both theories fail as a matter of law.

A. **The Amended Complaints Plead No Basis for This Court to Find an "Implied" Obligation for Argentina to Cause INDEC to Publish Actual Real GDP in 1993 Prices.**

In its January 7, 2020 decision, this Court correctly held that, under the Global Security, "the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices." *Aurelius*, 2020 WL 70348, at *7 n.7.  These sophisticated Plaintiffs "could have bargained for" such a provision, but "did not do so." *Id.* at *7.  Thus, Plaintiffs are left to urge the Court to *rewrite* the Global Security and to impose an obligation on the Republic that the parties did not bargain for.  This Court should reject Plaintiffs' legally flawed tactic.

*First*, New York courts are "extremely reluctant to interpret an agreement as impliedly stating something" and may not add terms "under the guise of interpreting the writing." *ACE Sec. Corp.* v. *DB Structured Prod., Inc.*, 36 N.E.3d 623, 630 (N.Y. 2015); *see Rowe* v. *Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 570 (N.Y. 1978) ("[A] party who asserts the existence of an implied-in-fact covenant bears a heavy burden.").  Courts are "especially" reluctant to find an implied obligation when dealing with "sophisticated, counseled business people." *2138747 Ontario, Inc.* v. *Samsung C & T Corp.*, 103 N.E.3d 774, 780 (N.Y. 2018).

In *CCM Rochester, Inc.* v. *Federated Investors, Inc.*, for example, the plaintiff could not carry its "heavy burden" even in circumstances where the defendant willfully sought to minimize the payments due under the parties' contract.  *See* 2014 WL 6674480 (S.D.N.Y. Nov. 25, 2014) (Caproni, J.).  There, two "highly sophisticated" parties, CCM Rochester ("CCM") and

Federated Investors ("Federated"), executed an agreement under which Federated acquired CCM's investment products.  *Id.* at *1-2.  In return, CCM received "contingent payments [] over five years . . . which were tied to the growth in revenues of the acquired business."  *Id.* at *2.  After Federated failed to market [CCM's] investment products and even "affirmatively steered" clients away from CCM's acquired business, CCM filed a lawsuit alleging that Federated "breached an implied duty to use best efforts to market CCM's investment products."  *Id.* at *3, 6.  Although Judge Caproni found that Federated had taken "steps intentionally calculated to reduce" contingent payments to CCM, that was not enough to justify reading an implied obligation to market CCM's products into the agreement:  the court refused "to read substantive terms . . . that could have been, but were not, included in the contract."  *Id.* at *5-7.  The same reasoning bars finding an "implied obligation" to force INDEC to calculate and publish real GDP in 1993 prices here.

   ***Second***, Plaintiffs' request that the Court read an implied obligation into the Global Security is inconsistent with its terms, which treat the Ministry of Economy and INDEC as separate government agencies.  It is "axiomatic that an implied covenant cannot override the express provisions of a contract" and "[n]o obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."  *CIBC Bank & Tr. Co. (Cayman)* v. *Banco Cent. do Brasil*, 886 F. Supp. 1105, 1107, 1116 (S.D.N.Y. 1995) (Preska, J.) (rejecting implied covenant that would have prohibited bank from consenting to acceleration of Brazilian sovereign debt where agreement gave bank discretion to withhold consent).

   Plaintiffs concede that their implied obligation theory hinges on treating INDEC and the Ministry of Economy as "one and the same."  (Aurelius AC ¶¶ 12, 62, 71.)  But the Global Security clearly delineates between the Ministry's rights and responsibilities in performing the calculations relating to payment under the Global Security on the one hand, and INDEC's role as

the developer and publisher of GDP data on the other.  (*See* Aurelius AC Ex. B (2005 Global

Security), § 1(e) at R-4 (separately defining "INDEC" and "Ministry of Economy"); *see also id.*

at R-3 ("All calculations necessary to determine Excess GDP based on the information published

by INDEC will be performed by the Ministry of Economy.").)  Indeed, the Global Security imposes

no obligations on INDEC whatsoever.  Plaintiffs' implied obligation theory, which collapses any

distinctions between Argentina, the Ministry, and INDEC, is thus "inconsistent with other terms

of the contractual relationship." *CIBC*, 886 F. Supp. at 1116.[8]

   ***Third***, the Court's imposition of an implied obligation on Argentina to force

INDEC to calculate and then publish GDP figures that the agency concluded were not

representative of the Republic's economy would impugn INDEC's statutory independent and

preeminent role with respect to national statistics.  Plaintiffs' implied obligation presupposes that

INDEC is "under the control of the Republic," and that "the Republic has the power to compel

INDEC to publish [Actual Real GDP] data."  (Aurelius AC ¶¶ 12, 26.)  But Argentine law says

otherwise:  it gives INDEC the exclusive authority to "[e]stablish the methodological rules"

regarding statistics and authorizes INDEC to promote "the proper dissemination of all . . . statistical

information to the Ministries, Commanders in Chief, State Secretariats, provincial and local

governments, public and private organizations, and the population at large."  (Ex. 1 (Law No.

---

[8] Plaintiffs allege that absent an implied obligation, the contractual formulas would be "nonsensical" because there would be no assurance that inputs for such formulas would be available. (Aurelius AC ¶ 26; ACP Master AC ¶ 26; Novoriver AC. ¶ 28; *see* 683 Cap. AC ¶ 68; Adona AC ¶ 59.)  But this Court has already recognized that Plaintiffs "could have bargained for language that provided flexibility."  *Aurelius*, 2020 WL70348, at *7.  Instead, the parties agreed that the Ministry of Economy, as the calculation agent, would resolve such issues.  (*See infra* pp. 26-30.)  Moreover, Plaintiffs misapprehend their "heavy burden."  *Rowe*, 385 N.E.2d at 570. Plaintiffs must allege "not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole."  *Id.*

17622), § 5(c), (f).)[9]  The Argentine courts have held that INDEC's expertise-based, technical policymaking decisions are insulated from review.  (*See, e.g.*, Ex. 12 (*In re Mariscotti*) (affirming dismissal of action challenging INDEC's methodological decisions regarding consumer price index ("CPI") because such decisions were within "exclusive" power of INDEC under Law No. 17622, and rejecting allegation of INDEC manipulation of CPI data to avoid payment on bonds).)

Under New York law, the Global Security must be interpreted in light of this background Argentine law guaranteeing INDEC's independence in performing its technical policymaking functions.  *See Benfante* v. *Com. Ins. Co. of Newark, N.J.*, 162 N.Y.S.2d 715, 717–18 (N.Y. Sup. Ct. 1957) ("When parties enter into a contract, they are presumed to have in mind all the existing laws relating thereto or to the subject-matter thereof.  Those laws enter into the contract and define and determine it."); *Ronnen* v. *Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996) ("[T]he law in force at the time [an] agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein . . . and the contract will be construed in the light of such law.").  Applying these principles, the Court should not impose an atextual, implied obligation on Argentina to cause INDEC to publish outdated GDP figures when INDEC, at the urging of the IMF, already exercised its exclusive authority not to do so under its technical policymaking functions.

Implying such an extracontractual obligation on INDEC also would be contrary to principles of international comity:  "[A] New York court should not encroach upon another nation's sovereignty by requiring citizens"—much less the government itself—"to take actions within their home country that would contravene that country's laws."  *CE Int'l Res. Holdings,*

---

[9]      With respect to Argentine law, "the court may consider any relevant material or source." Fed. R. Civ. P. 44.1.

*LLC* v. *S.A. Minerals Ltd. P'ship*, 2013 WL 2661037, at \*18 (S.D.N.Y. June 12, 2013) (Netburn, J.); *see United States* v. *Ross*, 302 F.2d 831, 834 (2d Cir. 1962) ("Of course no court should order the performance of an act in a foreign country when that act will violate the foreign country's laws.").[10]

> For all these reasons, this Court should reject Plaintiffs' attempt to insert a covenant that they did not bargain for—and which runs contrary to Argentine law—into the Global Security.

### B.    Plaintiffs' Claims for Breach of the Implied Duty of Good Faith and Fair Dealing Fail as a Matter of Law.

> In the alternative, Plaintiffs allege that the Republic's failure to cause INDEC to publish Actual Real GDP in 1993 prices breached the implied covenant of good faith and fair dealing.  The Second Circuit has made clear that the covenant of good faith and fair dealing "will be breached only in a narrow range of cases," *Sec. Plans, Inc.* v. *CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014), and that "there is a presumption that all parties act in good faith," *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).  This is not one of those few cases where Plaintiffs have pled facts sufficient to overcome the presumption of good faith.

> Plaintiffs' theory is that Argentina's executive branch foresaw in "late 2013 and early 2014" that a payment would be due under the securities in December 2014 and set out to

---

[10]    Adopting Plaintiffs' implied covenant would be particularly inappropriate here because it would require the Republic to cause INDEC to publish outdated GDP data for the life of the securities—until 2035—at great economic cost.  "A promise by the defendant should be implied only if the court may rightfully assume that the parties would have included it in their written agreement had their attention been called to it." *Neuman* v. *Pike*, 591 F.2d 191, 195 (2d Cir. 1979).  In light of INDEC's exclusive authority over the Republic's official economic statistics and the significant cost of requiring INDEC to calculate and publish Actual Real GDP in 1993 prices for the 30-year life of the securities, "[a]ny such assumption in this case would be completely unwarranted." *Id.*

deliberately "stymie" holders.  (*See, e.g.*, Aurelius AC ¶¶ 5-6, 13; 683 AC ¶¶ 4-6.)  Without alleging any particularized facts, Plaintiffs speculate that the Republic "obscure[d]," "concealed," and engaged in "attempted obfuscation" to deny holders of the GDP-linked Securities payment by directing INDEC to (i) change how it calculated the Republic's real GDP, and (ii) then withhold the calculation of 2013 real GDP in 1993 prices.  (Aurelius AC ¶¶ 13, 72; ACP Master AC ¶¶ 13, 72; Novoriver AC ¶¶ 15, 88; 683 Cap. AC ¶¶ 116, 128; Adona AC ¶¶ 13, 76.)  Plaintiffs' conclusory allegations fall far short of Rule 9(b)'s heightened pleading requirements, and, in any event, their theory is contradicted by judicially noticeable facts.

### 1.    The Amended Complaints' Conclusory and Implausible Allegations Fail to Meet Rule 9(b)'s Heightened Pleading Requirements.

Plaintiffs' theory of a broad governmental conspiracy to deny holders their "Payment Amount" must satisfy Rule 9(b)'s heightened pleading standards, because the "wording and imputations of the complaint are classically associated with fraud."  *Meserole* v. *Sony Corp. of Am., Inc.*, 2009 WL 1403933, at *3 (S.D.N.Y. May 19, 2009) (Patterson, J.).[11]  Under Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To do so, Plaintiffs must "specify the who, what, where, when and why of the alleged fraud."  *Airport Mart Inc.* v. *Dunkin' Donuts Franchising LLC*, 2019 WL 4413052, at *13 (S.D.N.Y. Sept. 16, 2019) (Karas, J.).  Plaintiffs also must specifically "plead those events which give rise to a strong inference that . . . defendant[s] had an intent to defraud, knowledge of the falsity, or a

---

[11]    Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  *Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Courts routinely hold that plaintiffs must meet the heightened pleading requirements of Rule 9(b) when they allege a breach of the covenant of good faith and fair dealing.  *See, e.g.*, *Fernandez* v. *UBS AG*, 222 F. Supp. 3d 358, 387 (S.D.N.Y. 2016) (Stein, J.); *DeBlasio* v. *Merrill Lynch & Co., Inc.*, 2009 WL 2242605, at *12 (S.D.N.Y. July 27, 2009) (Sullivan, J.).  Plaintiffs' speculative allegations do not even meet Rule 8's plausibility standard for all of the reasons discussed in Parts II.B.1 and II.B.2.

reckless disregard for the truth." *Jus Punjabi, LLC* v. *Get Punjabi US, Inc.*, 640 Fed. App'x 56, 58 (2d Cir. 2016) (quoting *Cohen* v. *S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013)).  The Amended Complaints' skeletal allegations do not come close to meeting Rule 9(b)'s demanding standards.

      As a threshold matter, Plaintiffs do not identify any specific person who acted with fraudulent intent.  Instead, the Amended Complaints rest on legally insufficient group pleading and general allegations that "Argentina" concealed and obscured that payment would have been due for the 2013 Reference Year.  (Aurelius AC ¶¶ 13, 72; ACP Master AC ¶¶ 13, 72; Novoriver AC ¶¶ 15, 88; 683 Cap. AC ¶¶ 116, 128; Adona AC ¶¶ 13, 76.)

      Under Rule 9(b), Plaintiffs' failure to identify which Argentine officials had the requisite fraudulent intent or even which officials engaged in the supposed misconduct is fatal to their theory.  *See First Equity Corp. of Fla.* v. *Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) (Mukasey, J.) ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."), *aff'd*, 869 F.2d 175 (2d Cir. 1989); *Hayden* v. *Feldman*, 753 F. Supp. 116, 119 (S.D.N.Y. 1990) (Sprizzo, J.) (allegations insufficient where plaintiffs "failed to identify . . . who at either [defendant accounting firm] or [defendant law firm]" engaged in fraudulent activity).[12]

---

[12]    Plaintiffs assert that Argentina and INDEC are "one and the same legal entity" to get around their failure to plead a single instance of collusion between the Republic's executive branch and INDEC.  (Aurelius AC ¶ 12; Adona AC ¶ 16.)  But the multiple entities within the Republic cannot be treated as a "monolith" any more than the United States Government can be.  *In re Irving*, 1979 WL 15482, at *3 (2d Cir. Apr. 12, 1979) (holding National Labor Relations Board could appeal contempt order because it was not a party to criminal proceeding brought by the U.S. Department of Justice); *see* Ex. 1 (Law No. 17622) at § 5(f).  *Cf. Antero Res. Corp.* v. *S. Jersey Res. Grp., LLC*, 933 F.3d 1209, 1220 (10th Cir. 2019) (characterizing INDEC's U.S. analog, the Bureau of Labor Statistics ("BLS"), as a "third-party" where contract between United States and defense contractor relied on BLS data).

Plaintiffs also do not plead particularized facts giving rise to a "strong inference" that the unnamed Argentine officials acted with the intent to defraud.  Plaintiffs generally allege that the Republic sought to "duck [a] . . . $1.1 billion" payment to holders in 2014.  (683 Cap. AC ¶ 7.)  But generalized allegations that Argentina stood "to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)."  *Optionality Consulting Pte. Ltd.* v. *Nekos*, 2019 WL 4523469, at *11 (S.D.N.Y. Sept. 18, 2019) (Carter, J.); *see also Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on th[e] basis [of a desire to increase wealth] alone, virtually every company in the United States" would face fraud liability).

Plaintiffs' theory that an economic motive alone is sufficient to plead fraudulent intent is particularly flawed in the context of attributing motive to political officials.  Plaintiffs presume that Argentine politicians would prefer to save money for the Republic at the expense of announcing higher GDP growth.  (*See* 683 Cap. AC ¶ 7 ("[R]e-basing its GDP from 1993 prices to 2004 prices meant that the Republic could say that its economy only grew by 2.92% in 2004 prices, rather than 4.91% in 1993 prices (per the EMAE Index).").)  Under Plaintiffs' theory, the politicians' scheme would have shown a growth rate of under 3% rather than 5%.  But the Court can take judicial notice of the fact that politicians around the world generally prefer to be credited with more rather than less economic growth.  *See Onondaga Nation* v. *New York*, 500 Fed. App'x 87, 90 (2d Cir. 2012) (holding trial court could take judicial notice of "obvious facts").

Plaintiffs' conjecture that unspecified Argentine officials sought to defraud holders of the GDP-linked Securities is also implausible.  INDEC's GDP data is utilized for a host of purposes having nothing to do with the GDP-linked Securities, which would have been "sacrificed at the altar" as part of the alleged scheme.  For example, countries around the world—including Argentina—cite GDP growth in prospectuses of their debt issuances to encourage investment.

(*See, e.g.*, Ex. 13 (Argentina 2004 Prospectus) at 8; Ex. 14 (Argentina 2010 Prospectus) at 5; Ex. 15 (Mexico 2019 Prospectus Supp.) at (S16-18, S26-30).)  GDP data is also a key component in the methodology used by credit rating agencies to rate sovereign countries.  (*See* Ex. 16 (Moody's Credit Opinion – United States) 2-3, 7 ("Debt affordability, as measured by interest payments relative to revenue and GDP, is the main indicator determining our assessment."); *see also* Ex. 17 (Moody's Issuer Comment – Nigeria) at 2 (explaining that "key credit metrics [were] negatively affected" by Nigeria's 2014 rebasing).)  Reporting lower GDP growth to defraud GDP-linked Securities holders would thus increase the cost of issuing new debt and tend to reduce new investment by both Argentine and foreign investors.  (*See* Ex. 18 (World Bank - Innovative Financing for Development) at 88.)[13]

Plaintiffs' theory is all the more implausible because the Republic paid nearly $10 billion to holders of GDP-linked Securities from 2005 to 2013.  (*See* Aurelius AC ¶ 3; 683 Cap. AC ¶ 57; Adona AC ¶ 8.)  The Amended Complaints offer no plausible explanation for why unidentified Argentine officials sought in March 2014 to deprive holders of $1.1 billion in supposedly owed payments beyond the conclusory allegation that "Argentina was facing political and economic pressure to deny payment." (Adona AC ¶ 8.)  Indeed, the Republic's undisputed payments of nearly $10 billion from 2005 to 2013 to holders of GDP-linked Securities—which dwarf the $1.1 billion payment allegedly due in 2014—further undermine any inference of fraudulent intent.  *See In re Gans*, 75 B.R. 474, 487 (Bankr. S.D.N.Y. 1987) (Berk, J.) (finding

---

[13]    The Argentine government—again like governments around the world—bases its annual budgeting process on projected GDP growth, which are used, for example, to forecast tax receipts. (*See, e.g.*, Ex. 19 (Argentina – 2020 Draft General Budget Message) (noting that "any deviation in the expected trajectory for real GDP has a direct impact on the predicted dynamics of tax resources").)

plaintiffs failed to establish fraudulent intent where defendant made payment of interest on loan over seven years—"a substantial period of time").

The convolutedness of Plaintiffs' theory further belies any inference of intentional wrongdoing.  "When courts speak of 'clear opportunity' to commit fraud, they do not envision the kind of elaborate plot that is alleged to have unfolded in this case."  *Powers* v. *British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995).  Plaintiffs allege an expansive interagency conspiracy involving actions by a third-party statistical agency and potentially dozens of officials violating Argentine law, and somehow also involving the IMF, which was urging precisely the change that INDEC made.  Without well-pled facts of how this could be accomplished, Plaintiffs' theory is "well outside the realm of 'clear opportunity.'"  *Odyssey Re (London) Ltd.* v. *Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 295 (S.D.N.Y. 2000) (Buchwald, J.).

For all these reasons, Plaintiffs' theory of an illegal interagency scheme to defraud many thousands of holders is implausible on its face and the Amended Complaints do not satisfy Rule 9(b)'s heightened pleading requirements.

### 2. Judicially Noticeable Facts Contradict Plaintiffs' Speculative Conspiracy Theory.

Plaintiffs' theory of a massive interagency scheme fails for the independent reason that judicially noticeable facts show that INDEC's March 2014 decision had nothing to do with the GDP-linked Securities.  Rule 9(b) requires that Plaintiffs plead facts giving rise to a strong inference of fraudulent intent that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Duran* v. *Henkel of Am., Inc.*, 2020 WL 1503456, at *9 (S.D.N.Y. Mar. 30, 2020) (Engelmayer, J.) (quoting *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)).  The Court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing

inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  When conducting this analysis, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.* at 322.

Plaintiffs' speculation that INDEC ceased using 1993 prices to calculate real GDP in order to "stymie" holders (Aurelius AC ¶ 13), ignores the timeline set out above, *supra* pp. 9-11, which shows that INDEC's March 2014 decision to change the year of base prices had been made many years before and was accelerated at the urging of the IMF:

- in February 2013, INDEC was in the middle of conducting an "extensive," more than three-year study into rebasing when the IMF's Executive Board called on the Republic to update the 1993 base year using information from the 2004 economic census, *Aurelius*, 2020 WL 70348 at *4; (Ex. 5 (INDEC Mar. 2014 Press Release); Ex. 6 (Nov. 2013 IMF Rep.) at 1, 14);

- in August 2013, Argentina provided "an updated work schedule" that envisioned that "revised GDP data (with an updated base year) will be published by March 2014" (Ex. 6 (Nov. 2013 IMF Rep.) at 1, 15); and

- in December 2013, the IMF adopted a formal decision calling upon Argentina "to [r]elease to the public revised GDP data with an updated base year for the fourth quarter of 2013 and as far back as feasible" and called upon the Republic to do so "by *March 31, 2014*."  (Ex. 9 (Dec. 2013 IMF Decision) at 3 (emphasis added); *see* Ex. 10 (IMF May 23, 2014 Transcript of Press Briefing).)

Ultimately, the more "plausible" and "cogent" inference, *Duran*, 2020 WL 1503456, at *9, to be drawn from the allegations of the Amended Complaints and judicially

noticeable facts, *Tellabs*, 551 U.S. at 324, is *not* that countless and nameless Argentine officials conspired to "stymie" holders of the GDP-linked Securities. Rather, the competing inference—that INDEC was exercising the statistical judgment required under Argentine law and responding to the IMF's insistence that GDP data be promptly released with an updated base year—is far more plausible.[14]

## III. PLAINTIFFS CANNOT ESCAPE THE BINDING EFFECT CLAUSE, WHICH INDEPENDENTLY COMPELS DISMISSAL OF THEIR AMENDED COMPLAINTS.

The Court should dismiss the Amended Complaints for the independent reason that the Ministry of Economy's calculations are "binding . . . absent bad faith, willful misconduct or manifest error." (Aurelius AC Ex. B (2005 Global Security), § 1(e) at R-4.) This "binding effect" clause mandates deference to the Ministry's calculations here. The Court did not reach this issue in its January 7 decision. *See* 2020 WL 70348, at *6 n.5.

Contractual provisions that mandate deference to one party's calculations as the calculation agent are not uncommon in agreements that require "Byzantine mathematical calculation[s]." *Id.* at *1. *See, e.g.*, *Rogers Revocable Tr.* v. *Bank of Am., N.A.*, 2008 N.Y. Misc. LEXIS 7471, at *10 (N.Y. Sup. Ct. Nov. 13, 2008) (deference accorded to calculation agent in

---

[14]    Standard international practice also undermines Plaintiffs' inference of fraudulent intent. Widely used UN publications recommend that countries publish GDP figures in outdated year of base prices only for the period "*before [figures in the] new base year* are calculated." (Ex. 20 (UNECA) at 12.) 683 Capital and Adona allege that when countries rebase, they "typically" or "ordinarily" publish real GDP for both the old base year and the new base year, and these Plaintiffs claim that "India, Kenya, Nigeria, Tanzania, Uganda, and Zambia all published real GDP for the re-basing year in both the old series and the new series." (683 Cap. Am. Compl. ¶ 41; Adona Am. Compl. ¶ 48.) This is wrong. In actuality, none of these countries published real GDP for the rebasing year in both the old and new series because GDP in the old base year no longer accurately reflects a country's economy and is "obsolete." (Ex. 21 (Compilation of GDP Rebasing); Ex. 11 (UN, *Analysis - Rebasing GDP of Kenya*) at 2, 17.)

"complex and complicated" derivative instrument).  Even though such provisions may "cede[] an extraordinary amount of discretion and control" to the party who is the calculation agent, courts routinely enforce these clauses.  *Toledo Fund, LLC* v. *HSBC Bank USA, Nat'l Ass'n*, 2012 WL 2850997, at *7 (S.D.N.Y. July 9, 2012) (Forrest, J.) (defendant with "sole discretion" of "critical determinations" under a contract did not breach its contractual obligations where defendant "did not act arbitrarily or irrationally in exercising that discretion and control").[15]

The exceptions to the binding effect clause in Section 1(e) of the Global Security—"bad faith," "willful misconduct," and "manifest error"—set a high bar to any challenge to the Ministry's calculations.   Governing New York law makes clear that Plaintiffs must plead "dishonest purpose," "reckless disregard for the rights of others," or a "palpable and incontrovertible error" to defeat the Ministry's calculations:

- **Bad faith**—"New York law makes plain that bad faith requires a dishonest purpose." *Cifarelli* v. *Vill. of Babylon*, 93 F.3d 47, 52 (2d Cir. 1996) ("In breach of contract context, 'bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract.'"); *Versatile Housewares & Gardening Sys., Inc.* v. *Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 246 (S.D.N.Y. 2011) (Karas, J.) ("Bad faith 'is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it contemplates a state of mind affirmatively operating with furtive design or ill will.'").

---

[15]     *See, e.g.*, *Rogers*, 2008 N.Y. Misc. LEXIS 7471 (dismissing breach of contract claim where contractual provision gave defendant the "sole discretion" to make an adjustment and defendant's adjustment "clearly and significantly benefitted [defendant]"), *aff'd*, 881 N.Y.S.2d 298 (1st Dep't 2009); *Structured Credit Partners, LLC* v. *PaineWebber Inc.*, No. 602112/2001, slip op. at *2-4 (N.Y. Sup. Ct. July 2, 2002) (Ex. 22) (dismissing breach of contract claim where contractual clause gave defendant discretion to conduct calculations, even though defendants' calculations reduced plaintiff's expected profit by 75%), *aff'd*, 760 N.Y.S.2d 316, 316 (1st Dep't 2003) (affirming "in view of the provisions in the parties' agreements that defendant's . . . calculations 'shall be binding and final absent manifest error' and that defendant would not be liable to plaintiff absent willful misconduct, bad faith or gross negligence").

- **Willful misconduct**—requires well-pleaded facts showing "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Taylor Precision Prods., Inc.* v. *Larimer Grp., Inc.*, 2018 WL 4278286, at \*18 (S.D.N.Y. Mar. 26, 2018) (Carter, J.).

- **Manifest error**—is "[a]n error that is plain and indisputable." Black's Law Dictionary (10th ed. 2014); *see Rogers*, 2008 N.Y. Misc. LEXIS, at \*13 (manifest error "is 'something which is apparent by an examination . . . needing no evidence to make it more clear. That which is open, palpable, and . . . incontrovertible'"). *See also Sempra Energy Trading Corp.* v. *BP Prods. N. Am., Inc.*, 860 N.Y.S.2d 71, 72-73 (1st Dep't 2008) (alleged error in inspector's report of fuel oil specifications not "manifest error" despite subsequent report showing oil had different specifications); *Chleck* v. *Gen. Elec. Co.*, 2004 WL 2375803, at \*1 (S.D.N.Y. Oct. 22, 2004) (Rakoff, J.) (if "disagreements over how certain accounting methods were applied" amounted to manifest error, "'final and binding' would in practice mean transient and litigable, and the contractual language and intent would be rendered nugatory").

In addition, Plaintiffs must meet Rule 9(b)'s heightened pleading requirements, *see supra* Part II.B.1, to support their fraud-based allegations. Plaintiffs fall far short of doing so.

   *First*, Plaintiffs' claim that the Republic acted in bad faith or committed willful misconduct by "preventing" INDEC from publishing Actual Real GDP for Reference Year 2013 in 1993 prices (683 Cap. AC ¶ 118; Adona AC ¶ 116), rests on the same speculative and legally flawed allegations as their claim for a breach of the implied covenant of good faith and fair dealing. *See supra* Part II.B.[16] In particular, Plaintiffs fail to specify the who, what, where, when, and why of the alleged instruction to INDEC to change in March 2014 how it calculated the Republic's real GDP and withhold the calculation of 2013 real GDP in 1993 prices. *Id.* In addition, the IMF's

---

[16] Plaintiffs seemingly take issue with Argentina's "inaction," alleging that it "acted in bad faith by failing to ensure that INDEC published Actual Real GDP for Reference Year 2013 in 1993 prices." (*See, e.g.*, Aurelius AC ¶ 72; Adona Am. Compl. ¶ 18.) This allegation of bad faith fails under Rule 9(b) for all of the same reasons discussed in Part II.B.

remedial measures and standard international practice directly contradict Plaintiffs' claim that INDEC's decision to discontinue publishing Actual Real GDP in 1993 prices was "manifest error" or a mistake that was "palpable, and . . . incontrovertible," *Rogers*, 2008 N.Y. Misc. LEXIS, at *13.  *See supra* Part II.B.2.

   ***Second***, Plaintiffs disregard the clear language of the Global Security, which provides that all calculations are binding unless there is "bad faith, willful misconduct or manifest error *on the part of the Ministry of Economy*."  (Aurelius AC Ex. B (2005 Global Security), § 1(e) at R-4 (emphasis added).)  Yet, Plaintiffs primarily allege bad faith, willful misconduct or manifest error by *the Republic of Argentina*.  (*See, e.g.*, Aurelius AC ¶ 60 ("[T]he Republic breached the contract willfully, in bad faith and in manifest error."); 683 Cap. AC ¶¶ 14-15 ("Argentina's actions were demonstratively undertaken in bad faith and in willful disregard of the rights of holders . . . and lead to manifestly erroneous results.").)[17]  But multiple agencies of the Republic cannot be treated as a "monolith."  *Irving*, 1979 WL 15482, at *3.  Because Plaintiffs fail to adequately specify their allegations that the Ministry of Economy acted in bad faith or committed willful misconduct or manifest error, the Ministry's calculations are binding here.

   ***Finally***, Plaintiffs claim that the Republic "refus[ed] to follow the plain language of the contract" by not calculating the Base Case GDP Growth rate using the adjustment proviso in the Global Security in the way plaintiffs would prefer.  (*See, e.g.*, Aurelius AC ¶ 65.)  But Plaintiffs ignore the critical issue:  as Plaintiffs concede, there was a "missing" input (Aurelius AC ¶ 69) for the adjustment proviso, "[b]ecause INDEC had ceased publishing Actual Real GDP in

---

[17]  In the few instances where the Amended Complaints do allege bad faith, willful misconduct, and manifest error on the part of the Ministry of Economy (Aurelius AC ¶ 65; ACP Master ¶ 65), Plaintiffs' allegations are conclusory and not supported by specific facts, *see supra* Part II.B.

constant 1993 prices as of 2014," *Aurelius*, 2020 WL 70348, at *5; *see* Aurelius AC ¶ 65.  The Ministry of Economy's resolution of how to make the calculation of GDP growth in that circumstance is entitled to deference under Section 1(e) of the Global Security, because Plaintiffs have not plausibly alleged "bad faith," willful misconduct," or "manifest error" in the Ministry's calculation.  The Court therefore should dismiss the Amended Complaints for this reason alone.[18]

### CONCLUSION

As this Court has already held, these sophisticated Plaintiffs did not bargain for a requirement that INDEC continue to publish GDP figures in outdated year of base prices, and New York law does not countenance implying such a requirement in the Global Security.  Nor may Plaintiffs end-run this Court's January 7 decision by conclusorily and implausibly pleading that the entire Argentine government (urged by the IMF) switched the basis for calculation of GDP figures to defraud Plaintiffs.  The GDP-linked Securities specify that where judgment is needed to make the calculations that are required thereunder, the Ministry of Economy is empowered to exercise that judgment with binding effect, and Plaintiffs have not plausibly pled the required particularized facts sufficient to undermine the deference the securities give to the Ministry's judgment.

For these reasons, the Court should dismiss the Amended Complaints with prejudice.[19]

---

[18]    Plaintiffs also allege that the binding effect clause does not apply because the Ministry's calculations amounted to an impermissible "change to the 'method of calculation of the Payment Amounts'" under the "Modifications" clause of the Global Security.  (*See* Aurelius AC ¶ 65 n.7; Aurelius AC Ex. B (2005 Global Security), § 22.)  However, under the binding effect clause, the Ministry has the authority to address the unavailability of "necessary data," *Aurelius*, 2020 WL 70348, at *7, and thus no "modification" was required.

[19]    Leave to further amend should be denied because Plaintiffs have already been "given ample prior opportunity to allege a claim" and further amendment would be futile.  *De Jesus* v. *Sears, Roebuck & Co.*, 87 F.3d 65, 72 (2d Cir. 1996); *see Ganley* v. *City of New York*, 734 Fed. App'x 784, 786 (2d Cir. 2018) (upholding denial of leave to further amend complaint where plaintiff had

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White
Jason E. Kornmehl

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Counsel for The Republic of Argentina*

Dated:  June 8, 2020

---

already amended once in response to "a detailed explanation of the deficiencies he should address" and sought a second opportunity to "address the same deficiencies").